RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES HANNA,

        *Petitioner-Appellant*,

    *v.*

TODD ISHEE, Warden,

        *Respondent-Appellee*.

No. 09-3360

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00801—Thomas M. Rose, District Judge.

Argued: January 19, 2012

Decided and Filed: September 11, 2012

Before: SILER, CLAY, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Tyson L. Fleming, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Tyson L. Fleming, Rachel Troutman, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

CLAY, Circuit Judge. Petitioner James Hanna was convicted of aggravated murder by an Ohio jury and sentenced to death. He appeals an order by the district court denying his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. For the reasons set forth below, we **AFFIRM** the district court's judgment denying the petition.

1

**BACKGROUND**

I.     **The Crime**

The facts underlying Petitioner's conviction, as derived from the Ohio Supreme Court's decision denying Petitioner's direct appeal, are not in dispute:

In the late summer of 1997, Petitioner was an Ohio state inmate housed at the Lebanon Correctional Institution (LCI), located in Lebanon, Ohio. Petitioner was nineteen years into a life sentence for murder and aggravated murder when, around August 18, 1997, he was assigned a new cellmate, Peter Copas. The two had been cellmates for only four days when Petitioner brutally attacked Copas in his sleep. Although Copas initially survived the attack, he developed an infection and succumbed to his injuries several days later.

From the outset of the rooming arrangement, the relationship between Petitioner and Copas was strained. Petitioner was upset with prison officials for moving Copas into his cell without prior notification. His displeasure only mounted after Copas proved to be a less than ideal cellmate, using Petitioner's belongings without permission, unilaterally rearranging their cell, breaking Petitioner's TV set, and leaving the cell door open, resulting in the theft of some of Petitioner's property. The pair had words over these events and within two days of moving in together, Copas filed a formal transfer request, stating that he and Petitioner were "unable to co-exist."

On the evening of August 21, 1997, Copas returned to their cell drunk, crawled onto his top bunk, and vomited. According to Petitioner's later statements, at that point he decided he had "had enough." Around 4:00 or 5:00 a.m. that morning, Petitioner sharpened the tip of a paintbrush handle and lit it with matches to stiffen it into a shank. He then removed a padlock from Copas' lock box and placed it inside the end of a sock to create an additional weapon. As Copas slept, Petitioner stood up from his bunk, approached his cellmate, and thrust the paintbrush deep into Copas' closed eyesocket.

Copas awoke and demanded, "Why the hell did you do that?" Petitioner responded by bludgeoning his victim with his fists and the padlock, beating Copas into

unconsciousness. Petitioner then flushed the paintbrush handle and the sock down the toilet, replaced Copas' lock, and returned to his own bed to smoke a cigarette.

Around 6:00 a.m., Copas regained consciousness and ran to the cell door, screaming, "My celly's trying to kill me!" A corrections officer discovered Copas bleeding profusely at the door of the cell. Copas was taken to the prison infirmary, and Petitioner was handcuffed. When a guard asked what happened, Petitioner responded, "I told them not to put him in here with me."

Copas was transferred to the Middletown Regional Hospital for treatment of his injuries. The emergency room physician, however, did not realize that Copas had been stabbed, because the prison infirmary did not report such an injury, and Copas apparently did not notify anyone either. The physician saw no indication of a foreign object, and x-rays taken of Copas' face and skull were negative. The emergency room physician did not order a CAT scan.

Copas was treated at the hospital for superficial injuries and returned to the prison. Once there, however, LCI's medical director became concerned that Copas might have suffered a concussion during the attack. Four days later, a CAT scan was taken which revealed five inches of the wooden paintbrush handle lodged in Copas' skull, just behind his severely swollen right eye. Doctors immediately performed surgery, and Copas appeared to recover quickly. However, on September 5, 1997, Copas developed a post-surgical infection. His condition rapidly deteriorated, and he lapsed into a coma. He died on September 10, 1997, nineteen days after the attack.

According to statements Petitioner later made to authorities and in letters he wrote to a fellow inmate, Petitioner admitted the attack and provided some insight into his underlying motivations. Petitioner explained that he chose to stab Copas in the eye because "the ear is too hard. You would use an ice pick in the ear. The eye is much softer." Petitioner also bragged that he "stabbed one of [Copas'] eyeballs up out of its socket." Petitioner explained that he "didn't mean for the [paintbrush] to break," and that he "wanted it to go further in than what it did, but it broke off." Petitioner told his friend that "those idiots of the administration there wouldn't move [Copas] the hell out of my

cell, so I took him out of his misery." Petitioner described "beat[ing] all on his stupid-ass-head off-and-on for two hours." Petitioner also allegedly told another LCI inmate that he tried to "bash the motherfucker's brains in" because Copas "had turned his TV off on him." *See State v. Hanna*, 767 N.E.2d 678, 686–89 (Ohio 2002).

## II.     The Guilt Phase of Trial

On January 26, 1998, a Warren County, Ohio grand jury issued a two-count indictment against Petitioner for (1) aggravated murder with prior calculation and design, in violation of Ohio Rev. Code Ann. § 2903.01; and (2) possession of a deadly weapon while under detention, in violation of Ohio Rev. Code Ann. § 2923.131(B). The murder charge was designated a capital crime pursuant to three aggravating specifications: (1) commission of the offense while in a detention facility, under Ohio Rev. Code Ann. § 2929.04(A)(4); (2) being a repeat offender of an offense including as an essential element the purposeful killing or intent to kill another, under Ohio Rev. Code Ann. § 2929.04(A)(5); and (3) being a repeat violent offender under Ohio Rev. Code. Ann. § 2929.01. The possession of a deadly weapon charge was also subject to a repeat offender specification under Ohio Rev. Code Ann. § 2941.149.

Petitioner was appointed counsel and proceeded to a fifteen-day jury trial in the Warren County Court of Common Pleas. The state's case against Petitioner consisted primarily of medical records, the testimony of prison officials and medical personnel, statements made by Petitioner to prison authorities following the attack, and letters Petitioner wrote to his friend, an inmate housed at another correctional institution.

Petitioner's defense dealt almost exclusively with his intent during the attack. He argued that he did not intend to kill Copas when he attacked him. Although trial counsel suggested that Copas' death was at least partially attributable to errors committed in his medical treatment, Petitioner did not formally pursue an intervening cause defense.

As evidence of Petitioner's intent, the state emphasized Petitioner's statements to authorities after the crime and the incriminating letters Petitioner wrote to his friend.

The state also introduced the testimony of James Ertel, a trooper who interviewed all the inmates housed on the same cell block as Petitioner and Copas. Trooper Ertel prepared an incident report that provided some background about the animosity between the cellmates and the overall tenor of the cell block's environment. Significant to the arguments before us, the state also called Ricardo Lee, a fellow LCI inmate who was a friend of Copas and who claimed to have knowledge about the cellmates' deteriorating relationship prior to the crime.

Based on the above evidence, the jury found Petitioner guilty of aggravated murder and the § 2929.04(A)(4) specification. The trial judge separately found Petitioner guilty of the §§ 2929.04(A)(5) and 2929.01 specifications. The deadly weapon charge was dismissed on the state's motion.

## III.     The Penalty Phase of Trial

Following the guilty verdicts, the trial court held a separate penalty proceeding on November 9 and 10, 1998. At the penalty hearing, defense counsel presented testimony by a psychologist, Petitioner's sister, an Ohio state trooper, and a corrections employee. Petitioner also made an unsworn statement, expressing remorse for his actions and asking the jury to consider the fact that he would be confined to maximum security isolation if they returned a sentence of life imprisonment. After less than a day of deliberation, the jury recommended the death penalty. The trial court entered final judgment on November 20, 1998, sentencing Petitioner to death.

## IV.     Subsequent Proceedings

On December 22, 1999, Petitioner filed for post-conviction relief before the state trial court, pursuant to Ohio Rev. Code Ann. § 2953.21. The trial court denied relief without discovery or an evidentiary hearing on March 22, 2001. *State v. Hanna*, No. 98CR17677, 2001 WL 3604367 (Ohio Ct. Com. Pl. Mar. 22, 2001) ("*Hanna II*"). Petitioner appealed, asserting three assignments of error. The Twelfth Circuit District Court of Appeals affirmed. *State v. Hanna*, No. CA 2001-04-032, 2002 WL 4529 (Ohio. Ct. App. Dec. 31, 2001) ("*Hanna III*"). The Supreme Court of Ohio denied a petition

for review and a motion for reconsideration.  *State v. Hanna*, 770 N.E.2d 1048 (Ohio 2002)  (table); *State v. Hanna*, 770 N.E.2d 1050 (Ohio 2002) (table).

In appealing his conviction and sentence to the Supreme Court of Ohio, Petitioner presented fifteen assignments of error.[1]  The court unanimously affirmed the conviction and sentence on May 22, 2002.  *State v. Hanna* 767 N.E.2d 678 (Ohio 2002) ("*Hanna I*").  Petitioner sought a writ of certiorari from the United States Supreme Court, which was denied on November 18, 2002.  *Hanna v. Ohio*, 537 U.S. 1036 (2002).

On September 25, 2003, Petitioner notified the United States District Court for the Southern District of Ohio that he intended to seek a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner requested appointment of counsel and leave to proceed *in forma pauperis*, which the district court granted.  On November 17, 2003, Petitioner filed a federal habeas petition, asserting ten grounds for relief.

Petitioner filed several motions for further discovery before the district court. He also filed a motion for an evidentiary hearing in order to develop his claims of a *Brady* violation and of ineffective assistance during the penalty phase of his trial.  The district court granted Petitioner's request for additional discovery.  On March 20 and 21, 2007, the magistrate judge conducted a two-day evidentiary hearing.

On November 18, 2008, the magistrate judge issued a report and recommendation (R&R) that recommended denying Petitioner the writ of habeas corpus. Petitioner filed objections to the R&R, and the state filed a response.  On February 26, 2009, the district court adopted the magistrate judge's report in full and denied the petition.  *Hanna v. Ishee*, No. C-1:03-cv-801, 2009 WL 485487 (S.D. Ohio Feb. 26, 2009) ("*Hanna IV*").

The district court granted a certificate of appealability (COA) on one claim, part of another, and four subclaims.  Petitioner requested an expansion of the COA from this

---

[1]A defendant sentenced to death under Ohio Rev. Code Ann. § 2904 is entitled to an appeal as of right before the Supreme Court of Ohio.  Along with the other issues presented on appeal, the state supreme court must independently weigh the aggravating circumstances against the mitigating factors to review the appropriateness and proportionality of the death sentence.  Ohio Rev. Code. Ann. § 2929.05(A).

Court, which was denied. On January 4th, 2011, Petitioner filed the present appeal, alleging four assignments of error.**²** The district court had jurisdiction pursuant to 28 U.S.C. § 2254. This Court takes jurisdiction under 28 U.S.C. § 2253(a).

## DISCUSSION

### I.     Legal Framework

#### A.     Standard of Review

Because Petitioner filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009). Pursuant to AEDPA, a federal court shall not grant a habeas petition with respect to any claim adjudicated on the merits in state court unless the state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to . . . clearly established federal law" if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762–63 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (internal quotations and alterations omitted). A state court decision is "an unreasonable application of clearly established federal law" if "the state court identifies the correct

---

**²**Petitioner did not brief his subclaim argument that he received ineffective assistance because his counsel failed to present significant mitigation evidence from his siblings. Accordingly, this argument is deemed abandoned. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

governing legal principle but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 763. Clearly established federal law is determined by the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Id.*

The Supreme Court has stressed that AEDPA's standard is "difficult to meet" and "demands that [state court] decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotations and citations omitted). A state court's factual determinations are entitled to a "presumption of correctness," only rebuttable by "clear and convincing evidence" that the state court based its determination on an "unreasonable determination of the facts." *See Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007). In reviewing whether a state court decision was an unreasonable application of federal law, we must remain mindful that "an unreasonable application of federal law is different from an incorrect [one]," *Williams*, 529 U.S. at 410, and decline to award habeas relief where fairminded jurists could disagree on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Recently, the Supreme Court further limited  review under § 2254(d) "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Thus, even if a petitioner was granted an evidentiary hearing pursuant to § 2254(e),[3] the federal court must disregard newly obtained evidence that supports a claim that was previously adjudicated on the merits before the state court. *Id.* *Pinholster* suggested, however, that the prohibition on new evidence might not always apply, using as an example the hypothetical defendant who diligently pursues his claim through the state courts, but nevertheless presents a "new claim" in

---

[3]Section 2254(e) provides an incentive to diligently investigate and pursue claims in state court by instructing that a petitioner who has "failed to develop the factual basis of a claim" before the state courts should not be granted an evidentiary hearing on federal review, unless the claim relies on (1) a new, previously unavailable rule of constitutional law, or (2) facts that could not have been previously discovered through the exercise of due diligence.
        A federal evidentiary hearing is also inappropriate unless the newly obtained evidence would be sufficient to establish, by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense. *See Williams*, 529 U.S. at 435.

federal court because of the forced production of evidence previously made unavailable to him during his state court proceedings.  *See Pinholster*, 131 S. Ct. at 1401 n.10 (Thomas, J. majority); *Id.* at 1417–18 (Sotomayor, J. dissenting).  The Supreme Court, however, declined to decide "where to draw the line between new claims and claims adjudicated on the merits."  *Id.* at 1401 n.10.

### B.     Procedural Bars

#### 1.     Exhaustion

AEDPA's standard of review applies only to claims that have been properly exhausted before the state courts.  Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State; or . . . there is an absence of available State corrective process."  To meet AEDPA's exhaustion requirement, we require a petitioner to prove that: (a) he has exhausted the remedies available in the courts of the state; (b) there is an absence of state corrective process; or (c) existing circumstances render the state's process ineffective to protect the petitioner's rights.  *D'Ambrosio v. Bagley*, 527 F.3d 489, 495 (6th Cir. 2008).  A claim is "fairly presented" for exhaustion purposes where the petitioner presented both the factual and legal basis for his claim to the state courts.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987)).

#### 2.     Procedural Default

A claim is also exhausted under § 2254(b) when it is clear that a petitioner would be barred from review due to a state procedural bar.  *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).  In such a case, though exhausted for AEDPA's purposes, the procedural default doctrine nevertheless bars federal review of the claim if the petitioner failed to comply with the state's adequate and independent procedural requirements.  *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  For purposes of determining procedural default, we look to the "last explained state court judgment."  *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (emphasis removed) (citing *Yist v. Nunnemaker*,

501 U.S. 797, 805 (1991)).  When that decision rests upon procedural default as "an alternative ground," we may, but are not required to, reach the merits of the claim on habeas review.  *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).

This Court applies a four-pronged analysis to determine whether a claim has been procedurally defaulted, looking to whether:

(1)    the petitioner failed to comply with an applicable state procedural rule;

(2)    the state courts actually enforced the state procedural sanction;

(3)    the state procedural bar provides an adequate and independent state ground by which the state has foreclosed federal review; and

(4)    if procedurally barred, whether the petitioner can demonstrate "cause" and "prejudice"," or a "fundamental miscarriage of justice" to excuse the default.

*See Murray v. Carter*, 477 U.S. 478, 495–96 (1986); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  To show cause, the petitioner must demonstrate some objective factor external to his defense that impeded his counsel's efforts to comply with the state's procedural rule.  *Murray*, 477 U.S. at 488.  To demonstrate prejudice, the petitioner must show more than the mere possibility of prejudice, but instead that the error worked to his actual and substantial disadvantage, "infecting his entire trial with an error of constitutional dimensions."[4]  *Id*. at 494.

In spite of these limitations, the Supreme Court has emphasized that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Rather, federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

With this framework in mind, we review Petitioner's claims for relief.

---

[4]A petitioner may also assert that his case raises a fundamental miscarriage of justice by arguing that he is actually innocent of the crime for which he was convicted.  *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995).  Petitioner does not raise a *Schlup* actual-innocence claim in this case.

II.     ***Brady v. Maryland***

    A.      **Introduction**

In Petitioner's first claim for relief, he argues that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it suppressed evidence relating to witness Ricardo Lee.  Lee, a fellow LCI inmate, was friends with Copas.  According to Lee, he and Copas applied for a rooming transfer shortly before the attack because they wanted to be cellmates.  Lee contended that, while waiting for the transfer to be processed, he attempted to act as a peacemaker between Petitioner and Copas.  Lee recounted several conversations he had with Petitioner, including one the day before the attack, when Petitioner allegedly told Lee that "[Lee] had better do something because his wick was getting short."  In an effort to impeach Lee's credibility, the defense asked whether Lee expected to receive or in fact received any consideration from the state in exchange for his testimony.  Lee denied exchanging any expectation or benefit for his testimony.

Later in the trial, the prosecution called an officer with the State Highway Patrol, Trooper James Ertel.  Trooper Ertel visited LCI shortly after the attack and interviewed sixty-nine individuals, including Petitioner, Lee, and the other inmates housed on their cell block.  Trooper Ertel prepared an extensive incident report (the "Ertel Report") memorializing these interviews, of which only portions were turned over to the defense before trial.  During his testimony, Trooper Ertel made several statements alluding to potential *Brady* material that had not been disclosed to the defense.  The trial judge immediately recessed the court, ordered all *Brady* material contained in the report to be disclosed to the defense, and granted defense counsel a weekend to review any newly obtained material.

On direct appeal and in his post-conviction petition, Petitioner argued that the prosecution's handling of the Ertel Report violated *Brady* in two respects.  First, he contended that by failing to timely disclose certain portions of the Ertel Report, the state deprived him of potential impeachment evidence.  Additionally, Petitioner broadly accused the prosecution of continuing to withhold relevant *Brady* material either

contained in the Ertel Report or that related to LCI's other inmates. The state courts denied Petitioner's delayed disclosure claim on all levels and rejected Petitioner's continued suppression claim, reasoning that it was speculative and otherwise unsupported by the record. *Hanna I*, 767 N.E.2d at 693–94; *Hanna III*, 2002 WL 4529, at *7.

On federal habeas review, Petitioner renewed his claim that the prosecution continued to withhold relevant *Brady* material.[5] In the interest of "clos[ing] the loop," the magistrate judge granted Petitioner full access to the prosecutor's files. There, Petitioner discovered Lee's prison disciplinary records and several letters written by Lee to the state prosecutor prior to trial.

In the first letter, dated June 17, 1998, Lee wrote that his "one objection to testifying on behalf of the state" was his concern for his continued safety at LCI should the other inmates learn he was a cooperating witness for the prosecution. Lee stated that he lacked "sufficient protection" from the other inmates and that he felt he had "no safety" at LCI. Lee categorically demanded to "be transferred to another prison" or else he would "refuse to honor any subpeanoe [sic]." Within a week of Lee's letter, he was transferred to a lower security correctional institution, despite the fact that his disciplinary records were inconsistent with such a transfer. The transfer documents indicate that Lee was moved at the request of the "Warren County Prosecutor" due to a "concern for [Lee's] safety." Shortly thereafter, Lee wrote a second letter to the prosecutor, dated June 28, 1998, expressing his "satisfact[ion]" with the transfer and his readiness "to carry out [his] duty as a competent witness." Lee affirmed that he was "pleased with his living conditions and available anytime."

Based on this new information, Petitioner argued that the state improperly withheld significant impeachment information regarding Lee's testimony.[6] Petitioner

---

[5]Petitioner also renewed his delayed disclosure claim; however, that issue was not certified for appeal.

[6]Petitioner also renewed his claim of tardy disclosure; however, that argument has not been certified for appeal.

accused the prosecutor of making a tacit arrangement to transfer Lee to a lower-security prison in exchange for his testimony and of being complicit in Lee's false statements to the contrary at trial.  The state disputes Petitioner's interpretation, contending that the letters demonstrate only a concern for Lee's safety.  In support, the state points to the prosecutor's testimony at the federal evidentiary hearing, affirming that the institutional transfer was for security purposes only and that the state did not consider the transfer to be consideration traded for Lee's testimony.  The district court denied Petitioner's *Brady* claim on the merits, finding that although the letters indicated that Lee probably sought special consideration for his testimony, there was "no evidence of a corresponding assurance or promise from [the prosecutor]."  *Hanna IV*, 2009 WL 485487, at *26.

### B.    Procedural Posture

Before addressing the merits of this claim, it is necessary to address the state's argument that Petitioner's *Brady* claim is unreviewable on federal habeas appeal. According to the state, Petitioner's current *Brady* claim is unexhausted, because the argument now before us is allegedly substantially different than the one Petitioner presented to the state courts.  Petitioner counters that he exhausted this claim when he generally accused the state of continuing to withhold *Brady* material about LCI's inmates, including Lee.  Petitioner also contends that any shortcomings in his efforts to exhaust should be excused based on the state's continued misconduct.

Although we agree that Petitioner diligently advocated for the broad release of all potential *Brady* material throughout his state proceedings, it is clear that the state courts were not fairly presented with the argument now made before this Court. Whether or not Petitioner's efforts to exhaust were sufficient, his current claim is easily distinguishable because the factual basis supporting his arguments has changed dramatically.  *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) (noting that a claim is only exhausted where the defendant has presented the state courts with both the legal and the factual bases supporting the claim).  Accordingly, Petitioner's present *Brady* claim is unexhausted.

Even if we could excuse Petitioner's failure to exhaust, the circumstances of this claim arguably play into *Pinholster*'s distinction between unexhausted claims and so-called "new claims." *See Pinholster*, 131 S. Ct. at 1401 n.10; *id.* at 1417–18 (Sotomayor, J. dissenting).[7] In *Pinholster*, the Supreme Court suggested that its restrictions might not apply where, as Petitioner alleges is the case here, new evidence emerges in federal habeas proceedings due to prosecutorial misconduct. *Id.* The Supreme Court noted that such new evidence might transform a previously unexhausted claim into a "new claim" nevertheless appropriate for federal habeas review. *Id.* However, neither this Court nor the Supreme Court has yet had occasion to develop this distinction, and because disposition of this issue is not required to deny relief on Petitioner's claim, we decline to do so here.

## C.      Legal Framework

Nevertheless, this Court may deny relief on the merits, notwithstanding a failure to exhaust, where appropriate. *See* 28 U.S.C. § 2254(b)(2). Because we are convinced that the newly discovered evidence does not entitle Petitioner to relief on this unexhausted claim, we elect to deny this claim on its merits.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a defendant's due process rights are violated if the prosecution suppresses material exculpatory evidence that is favorable to the defense. Likewise, the prosecution violates *Brady* if it fails to honor a defense request for specific exculpatory evidence or if it fails to volunteer evidence not requested by the defense, or requested only generally. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997). *Brady* applies regardless of the good or bad faith of the prosecution. *Strickler v. Greene*, 527 U.S. 263,

---

[7]The state appears to concede that, if we were inclined to excuse Petitioner's failure to exhaust, Petitioner would not be precluded under Ohio law from raising the new evidence supporting this claim in state proceedings. *See* Ohio Rev. Code § 2953.23(A)(1) (providing that a petitioner's second or successive petition for post-conviction relief will not be entertained unless the petitioner can show that he was "unavoidably prevented from discover[ing] the facts" and that "clear and convincing evidence" show that, "but for the constitutional error at trial, no reasonable factfinder would have found the petitioner guilty . . . or eligible for the death sentence."); *see also* Ohio Crim. Rule 33(6) (providing similarly that a defendant may seek a new trial when "new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.")

280 (1999). In addition to showing that the prosecution withheld evidence, establishing a *Brady* violation requires a defendant to show that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it was impeaching, *id.* at 281–82; and (2) the evidence was material, such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Jells v. Mitchell*, 538 F.3d 478, 501–02 (6th Cir. 2008).

## D.    Application

The district court denied this claim because, at least within this Circuit, evidence that a witness sought consideration for his testimony is only *Brady* material if there is cause to believe that the witness actually reached an express or tacit agreement with the prosecution in exchange for his testimony. *See Bell v. Bell*, 512 F.3d 223, 232–33 (6th Cir. 2008) (en banc) (citing *United States v. Risha*, 445 F.3d 298, 303 n.5 (3d Cir. 2006)); *see also Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *cf. United States v. Risha*, 445 F.3d 298, 303 n.5 (3d Cir. 2006).   Regardless of whether our stance qualifies as clearly established federal law, this case is arguably distinguishable from *Bell* in that the circumstances at least strongly imply that Lee was transferred in an effort to secure his willingness to testify.   Whether that action was taken solely out of a concern for Lee's safety, or whether it was procured in consideration for his testimony, is not a factual dispute that we need resolve.   Moreover, because this factual dispute could not be fully explored without the benefit of additional testimony which may be barred by *Pinholster*, we refuse to opine on whether the Lee letters actually qualify as *Brady* material.

Rather, even crediting Petitioner's interpretation of the letters and presuming that they ought to have been disclosed, Petitioner cannot obtain relief on this claim. Ultimately, Petitioner is unable to meet *Brady*'s materiality requirement, because the Lee letters cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). Likewise, Petitioner cannot show a reasonable probability that, had the evidence been

disclosed to the defense, his punishment would have been different. *Strickler*, 527 U.S. at 280.

Petitioner's defense rested nearly exclusively on the question of his intent at the time of the attack. On this score, Lee's testimony was of relatively minimal importance. Lee only corroborated a larger presentation of uncontested evidence showing escalating disputes between Petitioner and Copas preceding the attack. However, the defense did not dispute that Petitioner and Copas were openly hostile towards one another. And although Lee bolstered the government's case for motive, his testimony provided no additional insight into Petitioner's mind during the attack itself.

Petitioner reiterates the theory he put to the jury at trial—namely, that Lee was an instigator and active participant in Copas' threats against Petitioner, not the altruistic conciliator Lee made himself out to be at trial. However, Petitioner never argued that he was so threatened by Lee, Copas, or Copas' other friends that the attack was an act of self-defense. Likewise, Petitioner never argued that he attacked Copas in a misguided effort to assert his dominance or to secure his future safety in a violent prison environment. Accordingly, even had Lee been fully impeached and the jury been convinced that Lee or Copas had previously threatened Petitioner, these victories would not have affected Petitioner's concessions that the attack was committed while Copas was intoxicated and unconscious.

By contrast, Petitioner's own admissions provided the most probative evidence as to his intent during the attack—i.e., that he tried to stab the paintbrush in further, but that it broke off; that he chose to stab his victim in the eye, rather than in the ear, because "the eye is softer;" that he "took [Copas] out of his misery;" and that he "tried to bash the motherfucker's brains in." Compared against such statements, Lee's testimony about prior disagreements between the cellmates was not material. Accordingly, we cannot reasonably conclude that the result of the proceeding would have been any different had the defense successfully impeached Lee with the suppressed evidence.

Our conclusion carries through equally to the penalty phase of the trial. In presenting his case for mitigation, Petitioner deliberately eschewed arguments that

focused on the dangerousness of the prison environment or that argued that Petitioner was only violent when provoked or when he needed to protect himself. Had Petitioner pursued mitigation evidence of this type, Lee's testimony might have been more relevant. However, the defense deliberately avoided evidence that risked highlighting to the jury Petitioner's prior disciplinary infractions, as well as evidence that might have inflamed the jurors regarding the dangers of the prison environment. Accordingly, Lee's testimony was wholly immaterial to Petitioner's case in mitigation.

Because Petitioner's *Brady* claim is unexhausted and because he cannot demonstrate that the suppressed evidence undermines our confidence either in the verdict or in the punishment imposed, Petitioner cannot succeed under his first theory for relief.

## III.     *Strickland v. Washington*

Petitioner next claims that he suffered ineffective assistance of counsel during both the guilt and penalty phases of his trial. First, he argues that his trial counsel was ineffective in failing to discover that one of the jurors was ineligible for jury duty. Second, he contends that his trial counsel was ineffective for failing to present expert testimony regarding the impact of long term incarceration on Petitioner's psyche and conduct. Neither claim merits relief.

### A.     Legal Framework

Claims of ineffective assistance of counsel are analyzed under the familiar two-part performance and prejudice framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Darden v. Wainwright*, 477 U.S. 168, 184 (1986).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant

of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. "Ineffectiveness is not a question of basic, primary, or historical fact," but rather is "a mixed question of law and fact." *Id.* at 698.

This Court determines whether counsel's performance was deficient by reference to an objective standard of reasonableness, based on prevailing professional norms. *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 688). Counsel's performance must be assessed according to the time of representation, rather than viewed with the benefit of hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Because of the inherent difficulties in making this determination, this Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The burden rests on the defendant to overcome the presumption that the challenged conduct might be considered sound trial strategy. *Id.*

In order to demonstrate prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome"; certainty of a different outcome is not required. *Id.* "Thus, analysis focusing solely on mere outcome determination, without attention to whether the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

## B.    Failure to Discover Ineligible Juror

Petitioner's first *Strickland*-based claim focuses on his counsel's failure to discover that one of the individuals who served on his jury panel was a convicted felon, and thus, ineligible for jury service under Ohio law. *See* Ohio Rev. Code Ann.

§ 2961.01. Although the venire of prospective jurors was asked about their criminal histories in a written questionnaire, the juror at issue submitted responses that did not make his felon status immediately apparent. Petitioner claims that effective *voir dire* would have resolved any ambiguities in the juror's responses and automatically disqualified him from sitting on the panel. In his federal habeas appeal, Petitioner supplements this claim with evidence he alleges demonstrates that the juror was traumatized by exposure to prison violence during his own incarceration. Petitioner argues that the juror's personal background rendered him a particularly biased and inappropriate person to judge Petitioner's guilt.

### 1.        **Procedural Posture**

Before we can turn to the merits, we first consider the state's argument that Petitioner's claim is procedurally defaulted under Ohio's *res judicata* doctrine.

Petitioner did not raise this claim on direct appeal, but he included it in his post-conviction petition and his post-conviction appeal. The Ohio Court of Appeals and the Ohio Supreme Court considered and rejected this claim under both Sixth Amendment and ineffective assistance of counsel theories. The state courts reasoned that although nothing had prevented trial counsel from inquiring into the juror's felon status on *voir dire*, the record did not otherwise establish that whatever errors counsel might have committed deprived Petitioner of his right to a fair trial. *See Hanna II,* 2001 WL 3604367, slip op. at 1–3; *Hanna III*, 2002 WL 4529, at *4–5. As to Petitioner's ineffective assistance of counsel claim, the Ohio Supreme Court also found that it was precluded from granting relief because the claim was barred by Ohio's *res judicata* doctrine. *Hanna III*, 2002 WL 4529, at *5–6. In finding Petitioner's claim procedurally defaulted, the Ohio Court of Appeals reasoned that Petitioner could have raised his *Strickland* claim on direct appeal and that his failure to do so was not based on any evidence submitted outside the original trial record. *Id.* After careful consideration, we conclude that the Ohio Court of Appeals' decision precludes us from granting federal habeas relief on this claim.

Ohio Rev. Code Ann. § 2953.21(J), the state's post-conviction statute, provides the exclusive remedy for collaterally attacking a criminal conviction. Under Ohio's post-conviction procedure, two variants of *res judicata* apply to the collateral review of a criminal judgment. *Durr v. Mitchell*, 487 F.3d 423, 434 (6th Cir. 2007) (citing *Lundgren v. Mitchell*, 440 F.3d 754, 765 n.2 (6th Cir. 2006)). A claim is *res judicata* if (1) the petitioner could have brought a claim on direct appeal, but failed to do so; or (2) the claim was actually brought and decided on direct appeal. Thus, under Ohio's *res judicata* doctrine, a defendant may not raise a claim in a post-conviction proceeding that either could have been or actually was fully litigated at trial or on direct appeal. *See Agee v. Russell*, 751 N.E.2d 1043, 1049 (Ohio 2001). Pursuant to AEDPA, the state court's application of the *res judicata* doctrine constitutes an adequate and independent state ground barring federal habeas relief. *Durr*, 487 F.3d at 432 (citing *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001)); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *see also Wainwright*, 433 U.S. at 87. Accordingly, Petitioner's procedural default precludes relief unless he can show cause excusing his failure to follow the state's rule and prejudice resulting therefrom. *Maupin*, 785 F.2d at 138.

In assessing this question, we begin by noting that Ohio treats the post-conviction review of an ineffective assistance of counsel claim somewhat differently than we do in federal court. This Court generally demurs from addressing an ineffective assistance claim on direct appeal, because of the limited opportunity to develop and include record evidence that would bear on the merits of such an allegation. *See, e.g., United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010). The Ohio courts, by contrast, allow an ineffective assistance of counsel claim to be raised on direct appeal, and in fact, encourage it, because they apply the *res judicata* doctrine to *Strickland* claims, just as they would to any other, despite the comparative evidentiary limitations concomitant on direct appeal. *See, e.g.*, *State v. Cole*, 443 N.E.2d 169, 170 (Ohio 1982) (syllabus).

Nevertheless, Ohio has recognized two narrow exceptions which circumvent *res judicata*'s application and provide a petitioner with the opportunity to raise a *Strickland* claim for the first time on post-conviction review. Only one exception is

relevant here.[8] Pursuant to Ohio law, a petitioner may avoid *res judicata*'s bar if he can show that a "fair determination" of the ineffective assistance of counsel claim requires reference to evidence that was "outside the record" on direct appeal. *See id*. Because Ohio law prohibits the addition of new evidence to the trial record on direct appeal, *State v. Ishmail*, 377 N.E.2d 500, 502 (Ohio 1978), the state has excepted from *res judicata* those matters that may only be reasonably determined by reference to evidence that would necessarily fall outside the trial record—for instance, whether trial counsel sufficiently prepared in advance of trial or whether the defense had strategic motivations for its decisions. *See State v. Smith*, 477 N.E.2d 1128, 1131 n.1 (Ohio 1985). Although the outside-the-record exception provides a narrow escape from procedural default, the state's *res judicata* doctrine presents an Ohio defendant with somewhat of a procedural quandary—either he must raise his ineffective assistance of counsel claim immediately on direct appeal and risk a potentially premature dispositive denial, or he must forego his claim on direct appeal and simply hope that he can thereafter develop sufficient outside-the-record evidence to overcome *res judicata* on collateral review.

Applying Ohio's procedures here, Petitioner clearly failed to raise a *voir dire*-based ineffectiveness claim on direct appeal, and his claim was therefore procedurally defaulted on collateral review. The only way for Petitioner to have obtained collateral review on the merits of his *Strickland* claim was to present the post-conviction courts with sufficient outside-the-record evidence to surmount *res judicata*.

As the Ohio Court of Appeals recognized, Petitioner's main piece of outside-the-record evidence was an affidavit submitted by an expert in capital defense, David L. Doughten.[9] *Hanna III*, 2002 WL 4529, at *5. The Doughten affidavit provided detailed

---

[8] The other exception provides that if the same counsel who represented the defendant at trial also represents the defendant on direct appeal, *res judicata* does not apply. *State v. Lambrecht*, 568 N.E.2d 743, 745 (Ohio Ct. App. 1989) (explaining that counsel cannot be expected to argue his own ineffectiveness). Petitioner was represented by different counsel on trial than on direct appeal, so the first *res judicata* exception does not apply.

[9] Petitioner contends that the Ohio Supreme Court inaccurately identified the outside-the-record evidence he offered in support of this claim. Petitioner reiterates that this claim was actually supported by three pieces of evidence: (1) the felon juror's written questionnaire, which was not included in the direct appeal record; (2) an affidavit by one of Petitioner's trial counsel, Kelly Culshaw; and (3) the Doughten affidavit. Culshaw's affidavit, however, is limited to affirming that the questionnaire (and in fact, all the

opinions as to errors allegedly committed by trial counsel and opined that those errors constituted ineffective assistance. One error discussed in some detail was trial counsel's allegedly deficient performance during *voir dire*.

As the post-conviction decision makes clear, Ohio's case law conflicts as to whether an expert attorney affidavit actually constitutes outside-the-record evidence. *Id*. at *5. In finding that the affidavit did not overcome Petitioner's procedural default, the Ohio Supreme Court reasoned that "[t]he *voir dire* conducted by appellant's counsel [was] part of the record," and thus, the arguments and conclusions drawn therefrom by the expert at least could have been raised on direct appeal. *Id*. at *6.

Applying this standard, we can find no error in the Ohio Court of Appeals' analysis. The import of the Doughten affidavit was only to bolster legal arguments that were based on evidence that apparently could have been discovered and argued on direct appeal with due diligence. Petitioner's failure to raise this ineffective assistance of counsel claim on direct appeal therefore renders it procedurally defaulted under state law and ineligible for federal habeas relief.

### 2.      Application

Despite the procedural bar, we note that the Ohio Court of Appeals also impliedly considered this claim on its merits. In judging trial counsel's performance, the court obliquely referenced the Doughten affidavit and found that it "failed to demonstrate that [Petitioner's] trial counsel breached any essential duty . . . or presented sufficient operative facts to require an evidentiary hearing." *Id*. The court also suggested that Petitioner could not meet *Strickland*'s prejudice prong because "the evidence outside the record is only marginally significant and does not advance the petitioner's claim beyond a mere hypothesis and a desire for further discovery." *Id*.

---

questionnaires of the sitting jurors), were excluded from the direct appeal record. Her affidavit does not provide any satisfactory explanation as to why the attorneys handling Petitioner's direct appeal failed to obtain the questionnaires. When asked by this Court at oral argument, Petitioner's federal habeas counsel also could not answer this question. Nevertheless, even if the questionnaires and Culshaw affidavit should have been noted as separate pieces of outside-the-record evidence, the Doughten affidavit adequately recounted the contents of the other two documents. By reviewing the Doughten affidavit, the Ohio Supreme Court effectively considered all three pieces of evidence and found that none of it was sufficient to surmount *res judicata*.

Applying § 2254(d) review, we agree that this analysis was not contrary to or an unreasonable application of clearly established federal law.

### a.     Performance

The Sixth and Fourteenth Amendments guarantee a criminal defendant's right to a fair and impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citation omitted). The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (citing *Morgan*, 504 U.S. at 729). Should counsel perform so deficiently during the jury selection process so as to deny the defendant his Sixth Amendment right to an impartial jury, the defendant may be entitled to relief on the basis of ineffective assistance of counsel. *See Holder v. Palmer*, 588 F.3d 328, 338 (6th Cir. 2009).

As a starting point, the Sixth Amendment "does not require an absolute bar on felon-jurors," because a juror's felon status is not necessarily indicative of a bias against the defendant (or, for that matter, against the prosecution). *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992). Accordingly, it is inappropriate to invalidate, as a matter of law, any conviction simply because it was reached by a jury that mistakenly included a convicted felon. *Id.* Thus, the appropriate framework to review a felon-juror claim is to inquire whether the juror was partial and, in the context of this *Strickland* claim, whether trial counsel's failure to discover that partiality deprived Petitioner of his Sixth Amendment right. *Id.*; *see also Holder*, 588 F.3d at 338–339.

When confronting an allegation of juror bias, we must first look to whether the juror swore under oath "that he could set aside any opinion he might hold and decide the case on the evidence," and whether that "protestation of impartiality" ought to be believed. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A state court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness, *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003), and may "be

overturned only for 'manifest error.'" *Hill v. Brigano*, 199 F.3d 833, 843 (6th Cir. 1999) (quoting *Patton*, 467 U.S. at 1031).

"If a juror is found to have deliberately concealed material information, bias *may* be inferred. If, however, information is *not* concealed deliberately, the movant must show *actual bias*." *Williams,* 380 F.3d at 946 (emphasis in original) (quoting *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995)). To show actual bias, the defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). "The motives for concealing information . . . may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

Bias may not be inferred in the instant case because the record does not show that the juror in question deliberately concealed his felon status. In fact, the juror indicated several times in his questionnaire that he had experience with prison and probation services and that he had been incarcerated in the past. Although the juror did not volunteer his felon status on *voir dire*, he was never directly asked about it by either the government or defense counsel. The juror's written responses were somewhat cryptic and confusing, but they do not indicate deliberate evasiveness. Rather, the state and Petitioner appear to agree that the juror likely struggled to understand the questions asked of him. Even so, Petitioner maintains that the responses were sufficiently suspicious and should have triggered further investigation by Petitioner's trial counsel.

### b.     Prejudice

Even if this Court were to assume deficient performance, Petitioner cannot show (especially on the record that was before the state courts) that the juror harbored any actual bias. At *voir dire*, the juror testified that he would follow the court's instructions; that he would not assume guilt or innocence; that he could return a sentence less than death if the mitigating factors outweighed the aggravating circumstances; that he believed laws apply equally to inmates as they would to a "person on the street"; and that inmates were "human beings, just like everybody else." Additionally, the juror stated

that he would not let his knowledge of probation or parole departments impact his ability to be fair and impartial.[10] Given these responses, Petitioner cannot show prejudice and the state court's decision to deny relief was not contrary to, or an unreasonable application of, clearly established federal law.

### C.     Failure to Present an Adequate Case in Mitigation

Petitioner's argument that his counsel was ineffective for failing to present an adequate case in mitigation also fails. At the penalty phase, defense counsel focused on evidence showing that Petitioner suffered a troubled childhood. Petitioner now contends that this mitigation defense was constitutionally deficient because it focused on matters that occurred years before Petitioner's long incarceration and had no relevance to the person Petitioner became while in prison. Instead, Petitioner contends that his defense counsel should have introduced the additional proposed testimony of a psychologist and an expert in prison culture. He asserts that these experts could have testified that the stresses of lifelong incarceration, compounded with his organic neurological defects and troubled childhood, directly contributed to the attack.

### 1.     Application

On direct appeal, Petitioner argued that his counsel was ineffective for failing to engage an expert to testify on conditions of confinement. The court rejected the argument and held that testimony about prison conditions "was of questionable relevance," "did not relate to [Hanna], his background, or the nature and circumstances of the crime," and therefore, was "not mitigating." *Hanna I*, 767 N.E.2d at 702. On collateral review, Hanna raised a similar, but somewhat different claim, alleging that his

---

[10]In addition, the district court allowed Petitioner to depose the juror in order to develop his federal habeas petition. Although *Pinholster* precludes us from granting relief based on this new evidence, we have reviewed the deposition and are convinced that it does not warrant further consideration by the state courts. Although the juror made several statements regarding traumatic experiences he had while incarcerated, he also affirmed that he did not allow these experiences to bear on his service at Petitioner's trial. Likewise, the juror testified that he did not inform his fellow jurors of his status as a convicted felon, and he did not share his prison experiences with them. The juror further affirmed that he would not have answered the questions posed to him on *voir dire* any differently had further inquiry been made into his felon status or his impartiality. Given the overall tenor of these responses, we find that Petitioner would not likely make out a showing of prejudice, even considering the new evidence submitted in support of this claim.

counsel was ineffective for failing to engage the services of a prison culture expert to testify about how prison life affected him and to help the jury better understand the background of the incident. The post-conviction court summarily rejected this claim as brought "with the benefit of hindsight" and "lack[ing] operative facts" to find a *Strickland* violation. *Hanna II*, 2001 WL 3604367, slip op. at 11–12. The post-conviction appellate court glossed over this claim, agreeing that the items submitted in support, which included affidavits of proposed testimony from a prison expert and prison personnel, "alleged no operative facts to indicate that [the proposed testimony] would result in different findings by the jury . . . [or] that trial counsels' presentation violated the standards of *Strickland* []." *See Hanna III*, 2002 WL 4529, at *3. The district court agreed that Petitioner could not prove deficient performance. *Hanna IV*, 2009 WL 485487, at *27–31. We agree that Petitioner is not entitled to relief under § 2254(d).

### a.    Performance

Counsel's failure to make a reasonable investigation into the defendant's psychiatric history and family background, and to present sufficient mitigating evidence to the jury at sentencing, can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003); *Williams v. Taylor*, 529 U.S. 362, 363 (2000). In assessing whether counsel's efforts were deficient for failing to introduce certain evidence in mitigation, the focus must remain on whether counsel's investigation into various avenues of mitigating evidence was itself reasonable. *Wiggins*, 539 U.S. at 523. In assessing the reasonableness of the investigation, we take into account the quantum of evidence known to counsel, as well as whether the known evidence should have prompted a reasonable attorney to investigate further. *Id.* at 527. Further investigation is not required when counsel reasonably believes that such investigation would be "fruitless or even harmful." *Strickland*, 466 U.S. at 691.

Petitioner cannot claim that trial counsel utterly failed to investigate his case for mitigation. Rather, his argument is limited to a complaint that counsel should have pursued a different mitigation strategy. His argument cannot support a successful *Strickland* claim. The record shows that Petitioner received funds for an investigator,

a mitigation specialist, and a psychologist, who all were hired to assist in counsel's efforts to present a case in mitigation.   Dr. Kathleen Burch, Psy.D., a clinical psychologist, interviewed Petitioner prior to trial and provided the primary testimony on Petitioner's behalf during the penalty phase. Additionally, counsel sought and received an order to obtain any and all of Petitioner's medical, hospital, psychological, institutional, school, and employment records.  This investigation included records from as far back as Petitioner's early childhood to as recent as his prison records at LCI.  Dr. Burch's testimony referenced the records throughout her testimony, demonstrating that the effects of Petitioner's long-term incarceration were considered as part of her psychological assessment and more broadly as part of defense counsel's efforts to develop Petitioner's overall case for mitigation.  Given the above, Petitioner cannot show that his counsel utterly failed to consider a prison-life mitigation theory.

### b.      Prejudice

Moreover, *Strickland*'s prejudice prong cannot be met where the omitted testimony would be cumulative to other evidence already on the record. *See, e.g.*, *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006); *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005).  To this effect, Petitioner cannot show deficient performance because the jury was encouraged to consider the stresses of prison culture and the impact of its dangerous environment on Petitioner's behavior.  In discussing Petitioner's psychological defects and troubled background, Dr. Burch testified specifically that Petitioner's organic brain defects (1) impaired his impulse control; (2) caused him to perceive false threats and to overreact to minor threats; (3) negatively affected his concentration; and (4) hindered his long-term decisionmaking—all issues directly relevant to Petitioner's proposed prison life arguments.  Dr. Burch testified that Petitioner was "not a person that has been out in the world" and that "he has never really lived independently."  Although she admitted that her assessments were primarily based on records from Petitioner's childhood and juvenile incarcerations, her testimony also made clear that she had reviewed Petitioner's more recent prison records. For example, Dr. Burch referenced several specific conduct violations and notes that related to

Petitioner's incarceration at LCI.   Additionally, the overall tenor of Dr. Burch's testimony emphasized that Petitioner's psychological defects and childhood background had negative effects that could be expected to carry forward to his conduct as an adult.

In addition to Dr. Burch's expert testimony, trial counsel emphasized the stresses of prison life in closing arguments at both the guilt and penalty phases of trial.  Counsel pointed out that Petitioner had been incarcerated for approximately twenty years before the attack and urged the jury to view the cellmates' tense relationship through the lens of prison culture. Although Petitioner argues that expert testimony would have offered a unique perspective on these issues, the impact of additional testimony is simply too speculative to prove prejudice under *Strickland*'s and AEDPA's combined doubly high standard for relief.

Finally, and as the district court correctly noted, the testimony of a prison expert was, at best, a "double-edge[d]" sword.  *See Hanna IV*, 2009 WL 485487, at *27–31 (citing *Wiggins*, 539 U.S. at 535).  Much of the omitted evidence about prison culture risked highlighting Petitioner's problems in handling situations not strictly-controlled by prison authorities.  Such testimony also risked introducing Petitioner's history of disciplinary infractions, which included a prior attempted stabbing of a fellow inmate. *Id.* at *29–30.  This background would have undermined a pillar of Petitioner's case in mitigation—that the death penalty was not warranted because lifelong imprisonment in solitary confinement could adequately secure the future safety of prison guards and other inmates.

Given the above, Petitioner cannot show deficient performance and his argument for prejudice is exceedingly speculative.  Accordingly, the state court decision denying Petitioner's *Strickland* claim based on ineffective assistance of counsel during the mitigation phase does not warrant habeas relief.

## IV.     Flawed Jury Instruction

### A.     Introduction

In Petitioner's fourth claim for relief, he challenges the instruction provided to the jury on causation during the penalty phase of his trial. Petitioner argues that the causation instruction "fatally undermined" his defense, because it diluted the *mens rea* component of Ohio's aggravated murder statute in contravention of his right to due process.

Petitioner raised this claim on direct appeal and in his post-conviction proceedings. On direct appeal, the Ohio Supreme Court denied the claim on the merits. While recognizing that "the use of a foreseeability instruction in [an] aggravated murder case" was "questionable" under state law, the Ohio Supreme Court reasoned that the instructions as a whole made it clear that the jury had to find purpose to kill in order to convict. *Hanna I*, 767 N.E.2d at 693. The post-conviction courts also rejected this claim, finding that the causation instruction was not in error given that the trial court properly recited Ohio's definition of reasonable doubt. *Hanna II,* 2001 WL 3604367, slip op. at 10; *Hanna III*, 2002 WL 4529, at *8.

Petitioner renewed this claim in his federal habeas petition. The district court looked to the state court's decision on direct appeal and agreed with its analysis. *Hanna IV*, 2009 WL 485487, at *44–46. The district court concluded that because the trial court properly instructed the jury with respect to specific intent, it did not impermissibly lower the prosecution's burden of proof by also including the instruction on foreseeability. *Id*. at *46. The state urges us to affirm this ruling, arguing that because the Supreme Court has never invalidated this type of jury instruction on due process grounds, the state courts' rulings cannot be contrary to or an unreasonable application of clearly established federal law. We agree.

**B.      Legal Framework**

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "Supreme Court precedent clearly establishes that, '[i]n a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.'" *Joseph v. Coyle*, 469 F.3d 441, 464 (6th Cir. 2006) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). A jury instruction that shifts or relieves the state of its burden of proof also violates due process. *Sandstrom v. Montana*, 442 U.S. 510, 520–24 (1979).

In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court established the showing required to obtain habeas relief based on an incorrect jury instruction. *Estelle* made clear that "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id*. at 71–72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)). Rather, we must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id*. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990) (internal quotation marks omitted)). In doing so, it is incumbent upon the defendant to show that the challenged instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Id*. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). A challenge to a jury instruction is not to be viewed in "artificial isolation," but rather must be considered within the context of the overall instructions and trial record as a whole. *Id*. The category of infractions that can render an entire trial fundamentally unfair is narrow. *Id*. at 72–73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

**C.      Application**

Under Ohio's statute for aggravated murder, the prosecution is charged with proving that the murder was committed "purposefully, and with prior calculation and

design." Ohio Rev. Code Ann. § 2903.01(A). As part of its instructions, the trial court provided the jury with an instruction titled "Causation," which read as follows:

> The State charges that the act of the defendant caused the death of Peter Copas. Cause is an act which in a natural and continuous sequence directly produces the death of Peter Copas and without which it would not have occurred.
>
> The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The defendant is also responsible for the natural and foreseeable results that follow, in the ordinary course of events from the act.

*See Hanna IV*, 2009 WL 485487, at *45.[11]

Reviewing the challenged language in context with the jury instructions as a whole, the causation instruction stands in isolation when compared to the multiple points where the trial court properly instructed the jury on specific intent. As the district court noted, the trial court repeatedly advised the jurors that they could not convict Petitioner of aggravated murder unless they found that the state met its burden to prove Petitioner's specific intent to kill beyond a reasonable doubt:

> (1) [the jury] was required to find beyond a reasonable doubt that Mr. Hanna "*purposely caused* the death of Peter Copas with prior calculation and design"; (2) a person acts purposely when it is his *specific intent* to cause a certain result; (3) purpose is a decision of the mind to do an act with a conscious objective of *purposely* producing a specific result; (4) to do an act purposely is to do it *intentionally and not accidentally*; (5) no person may be convicted of aggravated murder unless he *specifically intended* to cause the death of another; and (6) prior calculation and design means that the purpose to cause the death was reached by a *definite process of reasoning* in advance of the homicide.

*Id.* at *46 (emphasis in original).

Bearing these repeated instructions in mind, we agree that the isolated causation instruction did not lower the prosecution's burden to prove intent. The instructions, read in their totality, clearly place the burden of proof on the state. Moreover, defense

---

[11]The language was apparently derived from Ohio's civil instruction on causation.

counsel's admonitions also drew a clear line between the issues of causation and intent, buttressing the distinction reflected in the jury instructions. Specifically, defense counsel conceded that Petitioner's actions caused Copas' death, but repeatedly underscored Petitioner's lack of intent to kill and advised the jurors, both in opening and closing arguments, that their verdict would turn almost entirely on this narrow issue.[12]

Petitioner cites to *Francis v. Franklin*, 471 U.S. 307, 310 (1985), for the proposition that an improper instruction may warrant habeas relief where the "dispositive issue" in the case is the defendant's intent to kill. However, this case is clearly distinguishable from *Francis* on both the law and the facts. In *Francis*, the Supreme Court granted habeas relief to a defendant whose victim was killed when he shot a bullet through a closed door. At trial, the defendant argued that the shot went off accidentally and that he lacked the requisite intent to kill. In granting relief, the Supreme Court focused on the instructions given to the jury on *intent*, not causation. The intent instruction in *Francis* specifically called upon the jury to presume that the defendant *intended* the natural and probable consequences of his acts. *Id*. at 309. Moreover, the overall instructions did not cure this error because they charged the defendant with rebutting the inference that he intended the foreseeable consequences of his actions. *Id*. at 315.

If anything, *Francis* underscores our conclusion that the state courts properly analyzed Supreme Court precedent in this case. The challenged instruction here is clearly distinguishable from the one in *Francis* because Petitioner's jury was only told that it could infer *causation* from the defendant's actions; the jury was not instructed to infer anything about Petitioner's *intent* from this conduct. Moreover, the error in describing causation, to the extent there was any, was attenuated from the essential

---

[12]Defense counsel's decision not to pursue an intervening cause defense was presumably strategic, given the difficulty of succeeding with such a theory under Ohio law, which provides that "[o]ne who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life. That rule has been qualified [only] where there has been a gross or willful maltreatment of the patient by the medical personnel, which is shown to have been an independent intervening cause of the patient's death." *State v. Johnson*, 381 N.E.2d 637, 640 (Ohio 1978); *see also State v. Dukes*, No. 2010-P-0027, 2011 WL 6938589, at *5–6 (Ohio Ct. App. Dec. 30, 2011).

element in dispute at trial. Finally, and in contrast to *Francis*, the overall instructions provided at Petitioner's trial were curative because they properly charged the jury as to specific intent, whereas the broader instructions in *Francis* only underscored the constitutional error. *Id*. at 315. Accordingly, *Francis* is not helpful to Petitioner's claim for relief.

Because the instructions, read overall, properly instructed the jury as to specific intent, we cannot conclude that they were so infirm as to warrant habeas relief. Although Petitioner's intent was of critical importance to his defense, this fact alone does not alter our analysis. The state courts' rulings were therefore not unreasonable applications of clearly established federal law. *See also Campbell v. Coyle*, 260 F.3d 531, 557 (6th Cir. 2001) (relying on *Sandstrom* to deny habeas relief where the defendants challenged causation instructions, but the jurors were properly instructed on specific intent); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000).

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment **DENYING** the petition for a writ of habeas corpus.