NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0335n.06

No. 17-2045

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MARK UNGER,

     Petitioner-Appellant,

v.

DAVID BERGH,

     Respondent-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    MOORE, CLAY, and KETHLEDGE, Circuit Judges.

**CLAY, Circuit Judge.**  Petitioner Mark Unger, who was convicted of first-degree premeditated murder pursuant to MCL 750.316(1)(a) and sentenced to life without parole by a Michigan jury in 2006, appeals from the judgment entered by the district court dismissing his petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### Factual Background

In its decision affirming Unger's conviction and sentence on direct appeal, the Michigan Court of Appeals described the facts giving rise to this case as follows:

> Defendant was the husband of Florence Unger (also referred to as the victim). Defendant entered residential rehabilitation in late 2002 for alleged prescription drug and gambling addictions. After completing rehabilitation, however, defendant did not return to work. Florence Unger filed for divorce in August 2003.

Notwithstanding the pending divorce proceedings, defendant traveled to the Watervale resort area on Lower Herring Lake with his wife and two children on October 24, 2003. The family arrived sometime in the afternoon and settled into the cottage that they had rented for the weekend. Not far from the cottage was a boathouse. On the roof of the boathouse was a wooden deck, where vacationers at Watervale often congregated. However, there were no other vacationers staying at Watervale on October 24, 2003.

Defendant was on the deck with the victim on the evening of October 24, 2003. Defendant told the police and several family friends that sometime after dark, the victim had asked him to go back to the cottage and check on the two children. Defendant explained that he walked back to the cottage, put the children to bed, and returned to the deck. Defendant told the police and several friends that the victim was not on the deck when he returned, but that he presumed that she had gone to speak with one of the neighbors. Defendant maintained that he then returned to the cottage and fell asleep watching a movie.

The following morning, defendant called neighbors Linn and Maggie Duncan. Defendant informed the Duncans that Florence had never returned to the cottage on the previous night. The Duncans got dressed and went outside to help defendant search for his wife. Linn and Maggie Duncan went toward the boathouse and discovered Florence Unger dead in the shallow water of Lower Herring Lake. It appeared that she had fallen from the boathouse deck. After finding the body, Linn Duncan came up from the boathouse and walked toward the cottages. Duncan met up with defendant in front of the cottages. According to Duncan, "I touched [defendant] on the chest" and said, "Mark, you're not going to like it. She is in the water." Duncan testified that defendant then "went ballistic," started "crying and screaming and hollering," and "went diagonally down to the water and jumped right in, right next to [the victim's body]." Duncan testified that it was not possible to see the victim's body from the location where he had met defendant because the view of the lake was blocked by bushes and trees. Duncan also testified that he had not given defendant any information whatsoever about the precise location of the victim's body.

Maggie Duncan called 911 and the police arrived at the scene. About 12 feet below the surface of the rooftop deck, an area of concrete pavement extends from the boathouse wall to the edge of Lower Herring Lake. The police observed a large bloodstain on the concrete pavement. Also found on the concrete pavement were one of the victim's earrings, one or two candles, a broken glass candleholder, and a blue blanket. There was no trail of blood between the bloodstain on the concrete and the edge of the lake. The railing surrounding the rooftop deck was noticeably damaged and was bowed out toward the lake.

Upon arriving at the cottage, the police noticed that defendant had already packed his vehicle and seemed eager to leave Watervale with his two sons. The police obtained a warrant to search the vehicle and the interior of the cottage. Among other things, the police recovered a pair of men's shoes from the vehicle. On one of the shoes was a white paint smear. The white paint was tested and was found to be chemically consistent with the white paint on the railing of the boathouse deck.

Defendant was arrested and charged with first-degree premeditated murder. At the preliminary examination, Dr. Stephen D. Cohle testified that the victim had died of traumatic brain injuries sustained upon impact with the concrete pavement. In contrast, Dr. Ljubisa J. Dragovic opined that the victim had not died from head injuries sustained upon impact with the concrete, but had drowned after being dragged or moved into Lower Herring Lake. The district court excluded Dr. Dragovic's opinion testimony and determined that there was no admissible evidence of premeditation. Defendant was therefore bound over for trial on a charge of second-degree murder.

Unlike the district court, the circuit court ruled that Dr. Dragovic's expert testimony was admissible. Accordingly, the circuit court allowed the prosecution to amend the information and to reinstate the charge of first-degree premeditated murder. The case proceeded to trial.

The prosecution argued that defendant had kicked or pushed the victim over the railing, and had then moved the victim from the concrete pavement into the lake in an effort to drown her. The prosecution relied heavily on the testimony of Dr. Dragovic and other expert witnesses. In response, the defense maintained that the victim's death had been accidental and that the victim had died of traumatic brain injuries nearly immediately upon striking the concrete. The defense presented expert testimony to support its theory that the victim had accidentally fallen over the railing and had rolled, bounced, or otherwise inadvertently moved into the lake. After an extensive trial, the jury convicted defendant of first-degree premeditated murder. He was sentenced to life in prison without parole.

*People v. Unger*, 749 N.W.2d 272, 281–82 (Mich. Ct. App. 2008) (alteration in original).

**Post-trial State Court Proceedings**

Following his conviction, Petitioner filed an appeal of right in the Michigan Court of Appeals, raising nine claims for relief, including: (1) the prosecutor committed misconduct by claiming that the defense attorneys asked their experts to lie, attacking the credibility of defense experts based on their fees, and by arguing, without record support, that bodies do not bounce; and

(2) defense counsel was ineffective in failing to object to the prosecutorial misconduct.  The Michigan Court of Appeals affirmed Petitioner's conviction.  *Id.* at 306.

On June 30, 2008, Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals and eight additional claims.  The Michigan Supreme Court denied leave to appeal.  *People v. Unger*, 769 N.W.2d 186 (Mich. 2008).

On November 6, 2009, Petitioner filed a motion for relief from judgment in the trial court, raising six claims for relief, only two of which are relevant to this appeal: (1) newly-discovered evidence showed that a key prosecution expert witness, Dr. Paul McKeever, relied on junk science; and (2) trial counsel was ineffective in the handling of Dr. McKeever's testimony.  After holding a three-day *Ginther* hearing (the Michigan process for developing facts to support an ineffective-assistance claim, *see People v. Ginther*, 212 N.W.2d 922 (Mich. 1973)), the court issued an oral opinion and a subsequent supplemental written opinion denying the motion.

On March 11, 2013, Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, arguing that (1) defense counsel was ineffective because he failed to investigate and expose the lack of support for Dr. McKeever's testimony, failed to seek exclusion of that testimony, and failed to prepare the defense expert to counter that testimony; and (2) juror errors deprived Petitioner of his right to a fair trial by an impartial jury.  On September 24, 2013, the Michigan Court of Appeals denied leave to appeal.  On October 29, 2013, Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which was also denied.  *People v. Unger*, 843 N.W.2d 513 (Mich. 2014).  On July 24, 2014, he then petitioned the U.S. Supreme Court for a writ of certiorari, again to no avail.  *Unger v. Michigan*, 135 S. Ct. 251 (2014).

**Current Proceedings**

On April 18, 2014, Unger filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, raising claims of ineffective assistance of counsel relating to trial counsel's handling of Dr. McKeever's testimony and its handling of alleged prosecutorial misconduct during closing arguments. The district court denied the petition. *Unger v. Bergh*, No. 14-cv-11562, 2017 WL 3314289, at *1 (E.D. Mich. Aug. 3, 2017). The court held that "Petitioner overstates the importance of the time-interval element of Dr. McKeever's testimony, and he understates the effectiveness of defense counsel's cross-examination of Dr. McKeever." *Id.* at *6. Further, "Petitioner also discounts defense counsel's substantial investigation and reasoned decision to limit cross-examination of Dr. McKeever, and ignores the substantial and compelling evidence incriminating Petitioner in the murder." *Id.* As for trial counsel's treatment of the prosecutorial misconduct, the court held that trial counsel did not fall below a reasonable standard by failing to object to the prosecutor's statements and that there was no reasonable probability that the result of the proceeding would have been different had counsel objected. *Id.* at *14–19.

The district court, however, granted a certificate of appealability on Unger's ineffective assistance claims. *Id.* at *19. And Unger timely filed a notice of appeal to this Court.

## DISCUSSION

Before this Court on appeal, Petitioner raises two claims: (1) the state court unreasonably applied clearly established Federal law when it held that Petitioner's trial counsel did not provide ineffective assistance in his handling of expert-witness testimony, particularly that of Dr. Paul McKeever; and (2) the state court's decision denying Petitioner's claim that trial counsel was

ineffective in failing to object to numerous instances of prosecutorial misconduct was both contrary to, and an unreasonable application of, clearly established Federal law.

## I.  Expert Witness Testimony

### Standard of Review

"On appeal of a denial or grant of a petition for a writ of habeas corpus, this Court reviews the district court's conclusions of law *de novo*[.]" *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014) (citing *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012)). "Although we generally review the district court's findings of fact for clear error, we review de novo when the district court's decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes no credibility determination or other apparent finding of fact." *Tanner v. Yukins*, 867 F.3d 661, 671 (6th Cir. 2017) (quoting *Newman v. Metrish*, 543 F.3d 793, 795–96 (6th Cir. 2008)). "It is . . . well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas." *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (citations omitted). Instead, "[o]ur review of the state court's decision . . . is generally 'governed by the standards set forth in the Antiterrorism & Effective Death Penalty Act of 1996,' also known as 'AEDPA.'" *Ceasor v. Ocwieja*, 655 F. App'x 263, 276 (6th Cir. 2016) (quoting *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000)). Where a state court adjudicates a claim on the merits, the Anti-Terrorism and Effective Death Penalty Act allows habeas relief only in limited circumstances:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "This is a difficult to meet, . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted). "The petitioner carries the burden of proof." *Id.*

Federal courts "measure state-court decisions 'against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen*, 563 U.S. at 182) (emphasis omitted). And a state court unreasonably applies clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result. *Williams*, 529 U.S. at 405. An incorrect or erroneous application of clearly established federal law is not the same as an unreasonable one; "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "AEDPA deference applies under § 2254(d) even when a state court does not explain the reasoning behind its denial of relief." *Carter v. Mitchell*, 829 F.3d 455, 468 (6th Cir. 2016) (citing *Harrington*, 562 U.S. at 99). Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Indeed, the

Supreme Court has emphasized that "[e]ven a strong case for relief does not make the state court's contrary conclusion unreasonable." *Harrington*, 562 U.S. at 88. "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "In *Strickland,* [the Supreme] Court made clear that 'the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial.'" *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 689) (second alteration in original). "Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland*, 466 U.S. at 686) (alteration and emphasis in *Cullen*)).

*Strickland* recognized the "tempt[ation] for a defendant to second-guess counsel's assistance or adverse sentence," 466 U.S. at 689, and therefore the Supreme Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.* at 690. *Strickland* imposes a two-prong framework for a defendant to overcome this strong presumption. Under *Strickland*'s first prong, Petitioner must demonstrate that "counsel's representation was deficient in that it 'fell below an objective standard of reasonableness.'" *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 688). In assessing whether counsel's performance was deficient, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial

strategy." *Strickland*, 466 U.S. at 689 (citation and quotation marks omitted). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).

*Strickland*'s second prong requires Petitioner to show "prejudice," *i.e.*, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (citation omitted). And "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington*, 562 U.S. at 105. Therefore, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* (quoting *Strickland,* 466 U.S. at 690). Further, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* Because § 2254(d)(1) of AEDPA limits the circumstances in which federal courts may grant a writ of habeas corpus, the Supreme Court has described habeas review of state court adjudications of ineffective assistance of counsel claims as "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In short,

"[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. It is under this strict framework that this Court reviews Petitioner's claims.

**Analysis**

Unger retained a formidable defense team of four seasoned attorneys to represent him at trial. Among that team, Thomas McGuire, a thirty-six-year veteran attorney who specialized in medical malpractice and product liability cases was charged with handling the expert medical and engineering witnesses through the course of the trial. Petitioner's primary ineffective assistance claim focuses on Mr. McGuire's handling of the expert testimony of Dr. Paul McKeever.

Dr. McKeever testified for the prosecution as an expert in anatomical pathology and neuropathology. He testified that he was a professor at the University of Michigan School of Medicine and chief of the neuropathology section of the pathology department. He reviewed Florence's autopsy photographs, as well as slides of her brain tissue, including tissue from the corpus callosum, which is located above the brain stem. Dr. McKeever used immunohistochemical staining to determine the presence of axonal injury. He testified that axonal injury does not occur after death and that a victim must have survived for at least 90 minutes following injury for immunohistochemical staining to detect axonal swelling. Several staining techniques were used, including neurofilament staining ("NF") and neuron-specific enolase staining ("NSE"). He also testified that, using the NF technique, he found evidence of axonal swelling in the corpus callosum. Therefore, he opined that Florence survived for at least 90 minutes after she struck the concrete. Dr. McKeever testified that his conclusions regarding survival time were based on articles published in peer-reviewed journals and collected by him in

a Medline[1] search. The prosecution used McKeever's testimony as evidence to show that Florence's death was not accidental.

### 1. *Strickland*'s "Performance Prong"

Petitioner claims that Mr. McGuire failed to read the key articles upon which Dr. McKeever based his testimony. This failure to read, Petitioner argues, "led to a cascade of additional errors by counsel, including the failure to seek to exclude Dr. McKeever's testimony, the failure to effectively cross-examine Dr. McKeever regarding the lack of support in the articles for his testimony, and the failure to provide the articles to his own expert." (Brief for Petitioner at 20.)

It is true that "[c]ourts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client." *Towns*, 395 F.3d at 258. This is because "[i]t is well-established that '[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691) (second alteration in *Towns*). But Petitioner fails to identify any specific evidence that trial counsel did not read the articles and did not conduct a reasonable investigation.

Petitioner cites this Court's decision in *Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011), for the proposition that the failure to read key evidence can constitute deficient performance. In *Couch*, the defendant was charged with second-degree murder arising out of a fight with the decedent, and the key issue at trial was whether the decedent died directly from the defendant's blows or from other factors, including his recent ingestion of a large amount of cocaine. *Id.* at 246. The prosecution argued that it was the former and introduced testimony that the cause of

---

[1] Medline is a database for medical researchers similar to Westlaw for attorneys.

death was "asphyxia from inhaled blood that resulted from blunt-force injury to the face." *Id.* at 243. The problem for the prosecution was that a report from the fire department called into question the prosecution's "drowned in his own blood" theory. *Id.* at 246. Luckily for the prosecution, trial counsel did not read that report. The Court ultimately held that it was ineffective assistance for counsel not to have read the report. *Id.* at 246–47. Petitioner in this case argues that "[t]he ineffective assistance in *Couch* was nearly identical to trial counsel's here." (Brief for Petitioner at 21.)

But *Couch* presented a situation fundamentally different from the case at hand. In *Couch*, the defendant "not only told [his counsel] to pursue the [alternative causation] defense but also told him how to do so: by obtaining the fire department report about the incident." *Couch*, 632 F.3d at 246. Nonetheless, counsel still failed to do so. Further, the *Couch* court noted, "That the report was readily accessible makes [trial counsel]'s reluctance to ask for it all the more inexcusable and all the more removed from a 'reasonable professional judgment[].'" *Id.* (alteration in *Couch*).

This case is very different from the egregious situation in *Couch*. Petitioner in this case has identified no evidence supporting his claim that trial counsel did not read the articles. Petitioner instead argues that it is "clear" that trial counsel did not read them because "had trial counsel read the articles, he would have *immediately* recognized that the articles did not say anything like what Dr. McKeever said they did." (Brief for Petitioner at 25 (emphasis in original).) Then, trial counsel "would have immediately recognized that he had in his hands information that would eviscerate the prosecution's key expert witness on the key issue at trial. And he would have used the articles to exclude Dr. McKeever's testimony altogether or to completely discredit him

on cross-examination." (*Id.* at 25–26.) Because "[t]rial counsel did none of this," Petitioner concludes, "the record is inescapably clear that he did not actually read the articles." (*Id.* at 26.)

At the *Ginther* hearing, trial counsel for the defense was asked whether he recalled making "any sort of analysis" to determine whether the articles supported the Dr. McKeever's 90-minute-survival conclusion. (R. 13-4, *Ginther* Hearing Tr., PageID # 4033.) He responded as follows:

> I don't know. I'm not sure. I don't have any memory that I did and I don't have any memory that I didn't. I don't know. I had a sheet of abstracts that was pretty long and in cases where the abstract looked like it was promising, we got some of the abstracts and I had them – I believe I had them in the courtroom. I think [Dr.] Schmidt may have had some of his own. I don't know. I'm not sure I can tell you the answer to that.

(*Id.* at PageID # 4033–34.) Petitioner calls Mr. McGuire's testimony "hedging." (Brief for Petitioner at 26). This so-called "hedging" might indicate that McGuire, in fact, did not read the articles; or it might simply indicate that the trial occurred six years before the *Ginther* hearing and Mr. McGuire had understandable difficulty recalling the details of the case. Indeed, it is worth noting that when Mr. McGuire was asked whether he recalled Dr. McKeever's testimony that the victim survived for at least 90 minutes—the very testimony that Petitioner now says was the linchpin of the prosecution's case—he could only reply, "I think I do." (R. 13-4, *Ginther* Hearing Tr., PageID # 4032.) We decline to read too much into Mr. McGuire's inability to recall whether he read the articles in question.

Further, Petitioner's claim that the articles provide no support for Dr. McKeever's testimony simply overstates the record. Petitioner points to a hypothetical question posed by his post-conviction counsel that he claims would have "*devastated* Dr. McKeever." (Brief for Petitioner at 24–25 (emphasis in original).) That question asks Dr. McKeever to identify "any sentence in [the articles] that even arguably supports that conclusion." (*Id.* at 25 (citing R. 13-10, *Ginther* Tr., PageID # 4482).) Petitioner asserts, "That one simple question would have left Dr.

McKeever fumbling through the articles, unable to identify even a single sentence supporting his testimony, and finally forced to admit that there was no support, that it was junk science through and through." (*Id.*) Thus, Petitioner argues that it is clear that counsel did not read the articles because, had he done so, "he would have *immediately* recognized that the articles did not say anything like what Dr. McKeever said they did." (*Id.* (emphasis in original).) But this is questionable. Indeed, the "Ogata Study," one of the studies on which Dr. McKeever relied, concludes as follows:

> In animal experiments, however, Lewis et al. reported that [amyloid precursor protein] could detect injured axons in sheep as early as 1 h after injury, but this is not comparable to the human experience. While our preliminary studies have indicated that NSE staining detected injured axons in 2 cases with 0.5 and 1 h of survival, critical examination and exclusion of inadequate cases showed that a 1.5 h survival period *is the limitation of* NSE and APP immunostaining.

(R. 20-11, Ogata Study, PageID # 6016 (emphasis added).)[2] The import of this passage is that the *limit* of immunohistochemical staining is one and a half hours of survival time; axonal injury cannot be detected before then. Although this study referred to NSE staining and Dr. McKeever testified that he based his results on NF staining, it is not at all obvious to the uninitiated that the results as to one do not have implications for the other. Moreover, Mr. McGuire stated that he thought that highlighting the distinction between NF and NSE was irrelevant in this case because, although Dr. McKeever appeared at trial to rely on NF staining, he had relied upon NSE staining during his depositions. Mr. McGuire explained at the *Ginther* hearing that he did not cross-examine Dr. McKeever on this apparent contradiction because he believed that Dr. McKeever's failure to mention NSE was an oversight and McGuire did not believe that examining this

---

[2] At the *Ginther* hearing, a medical expert for the defense, Dr. Colin Smith, testified that the Ogata study only supported a finding that if you have a survival time of 90 minutes, you can detect axonal injury, not that if you detect axonal injury, you can infer a survival time of 90 minutes. Nonetheless, we are reluctant to say that defense counsel was constitutionally deficient for taking a medical journal at its word rather than interpreting the results as a diagnostic neuropathologist would.

contradiction was essential to the defense. As he said, "I didn't point out the difference because I didn't think it made any difference if we showed that he had no support for NF – neurofilament staining because they did have support for NSE staining. So I didn't think we gained any ground." (R. 13-4, *Ginther* Tr., PageID # 4031.) In short, the record does not show a flagrant gap that went somehow unexamined by defense counsel.

What the record does show is that trial counsel undertook significant preparation to address and rebut Dr. McKeever's testimony:

> I spent a lot of time on my own computer doing Medline searches on these issues, and I met with [Dr.] Carl Smith and he also did – Carl Schmidt, I'm sorry. He also did Medline searches. And together we made an effort to find as much information as we could about all of these issues.

(*Id.* at PageID # 4033.) Also, prior to trial, Mr. McGuire reviewed the autopsy findings, met with the prosecution's experts, Doctors Cohle and Dragovic, multiple times, and he amassed "a collection of . . . maybe nine or ten major references on neurology and neuropathology and traumatic neuropathology," and discussed the medical issues with his own expert, Dr. Schmidt. (*Id.* at PageID # 4040, 4050).

But Mr. McGuire did not just collect this information, he used it with great effect. His cross-examination of Dr. McKeever demonstrated a strong grasp of the material. He walked McKeever through his medical testing procedures and got him to admit that he was unable to pin down a specific time of death. He referred Dr. McKeever to a study that he had not seen, which cast serious doubt on his 90-minute timeline. Then, according to Mr. McGuire's *Ginther* hearing testimony, he and his fellow counsel, Mr. Harrison, decided to ask no additional questions of the witness because they had "probed around the margins," "scored some points," and thought that was "about as good as [they] were going to be able to do with him." (R. 13-4, *Ginther* Hearing Tr., PageID # 4032–33.) At that point, counsel decided to rely on their own expert, Dr. Schmidt,

to undercut McKeever's testimony. And Mr. McGuire explained the strategy behind the decision

not to press Dr. McKeever and rely on his own witness as follows:

> A.   Well, I'm arguing with the witness about hours between injury and death, whereas, my own witness said that [immunohistochemical staining] shouldn't be used at all because it wasn't reliable – not a reliable test. Do I want to get into an argument with my opponent's witness or do I want to use my own witness to make the point? That's my dilemma.
>
> Q.   Couldn't you have done both?
>
> A.   I don't know. If I get into an argument that I lose I'm not sure it's a good idea.

(R. 13-4, Ginther Hearing Tr., PageID # 4040.) He explained that further cross-examining

Dr. McKeever carried a great degree of risk:

> I'm arguing with a guy who is a university professor with a lot of credentials and there are always risks when you do that. If I had nothing else to talk about I might agree with you. Or if the witness handed me some entre [sic] into that issue I would likely agree with you, also. But if I had some other evidence in my bag that I thought was reliable evidence, good evidence [namely, Dr. Schmidt's testimony], I might not do it.

(*Id.*)

In the end, rather than debating cutting-edge medical science with a scientist, trial counsel

decided to take what they believed to be the safer route: they put forth their own expert, the chief

medical examiner of the Wayne County Medical Examiner's Office, Dr. Carl Schmidt, to rebut

McKeever's testimony. Trial counsel selected Dr. Schmidt not just because of his credentials, but

because he was a "competent guy" and a "straight shooter," who they thought would play well to

a rural jury. (*Id.* at PageID # 4055.)

The trial court's oral opinion recognized the manifold judgment calls a defense attorney

must make and found McGuire's judgment calls reasonable and not prejudicial:

> [W]hat does Mr. McGuire say in his testimony? He says what all of us who dwell in courtrooms during trials for hours and hours know, there comes a point when you want to leave the other side's expert alone. You've got your own expert. You want to put in your testimony through your expert . . . . He thought he made some

16

points around the margins with Dr. McKeever and he didn't want to – he didn't want to lose the jury, try the jury's patience . . . he consulted with Mr. Harrison, an attorney with great trial experience, and they said to leave off that witness.

\* \* \*

There are many reasons not to push a cross-examination too far I would observe and that, in the opinion of this Court, is classic trial strategy.

(R. 13-10, *Ginther* Hearing Tr., PageID # 4498, 4500.)

Trial counsel's strategy ultimately failed. But there is nothing in the record to suggest that their handling of Dr. McKeever's testimony was inadequate or unreasonable. Petitioner faults his trial counsel for failing to press Dr. McKeever on how the particular articles he relied on failed to support his testimony. But Mr. McGuire instead sought to use Dr. Schmidt to undermine the entire enterprise of using immunohistochemical staining to infer survival time. The Supreme Court has recognized that there "are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Petitioner's current counsel may not have done the same thing that McGuire did, but McGuire's decision was clearly strategic. We therefore cannot say that defense counsel's handling of Dr. McKeever's testimony was constitutionally deficient. More to the point, we cannot say that there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. Thus, the state court's opinion is entitled to AEDPA deference and should not be disturbed.

## 2. *Strickland***'s "Prejudice Prong"**

Even assuming that Petitioner's counsel was deficient in its handling of Dr. McKeever, the petition should be denied. The record plainly supports a finding that even without Dr. McKeever's testimony, Petitioner could not show "a reasonable probability that . . . the result of [the trial] would have been different." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (quoting

*Strickland*, 466 U.S. at 694) (alteration in *English*).   Petitioner characterizes Dr. McKeever's

testimony as the *sine qua non* of the prosecution's case, but Petitioner fails to take into account the

strength of the prosecution's other evidence that would have supported the same outcome.  Indeed,

the prosecution introduced substantial other evidence of Petitioner's guilt.  The Michigan Court of

Appeals summarized that evidence as follows:

> As an initial matter, both Dr. Cohle and Dr. Dragovic concluded that the manner of death in this case was homicide. Both doctors excluded the possibility of accidental death because neither believed that the victim's body could have gotten into the water of Lower Herring Lake absent the purposeful actions of a second person.
>
> There was also substantial evidence to suggest that defendant had a motive to kill the victim. Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant. . . . In cases in which the proofs are circumstantial, evidence of motive is particularly relevant. . . . The victim had filed for divorce. Only days before her death, the victim had served defendant's divorce attorney with interrogatories asking probing questions about defendant's addictions and possible misuse of marital assets. Although the evidence showed that the victim was committed to ending the marriage, the proofs established that defendant was strongly opposed to the idea of divorce. The proofs also showed that defendant had threatened to take sole custody of the children and to take the marital home in the event that the victim further pursued the divorce. . . . There was also evidence of substantial life insurance policies on the victim's life. . . .
>
> Defendant also had the opportunity to kill the victim. Evidence of opportunity is logically relevant in a prosecution for murder. . . . The evidence presented at trial established that defendant and the victim were alone on the boathouse deck on the night of the victim's death. Even defendant, himself, admitted to the police that he was probably the last person to see the victim alive.
>
> There was also evidence that a scuffle or struggle may have taken place on the boathouse deck within a short time before the victim's death. The proofs established that the railing surrounding the boathouse deck had been damaged sometime on the day of the victim's death. Linn Duncan had been on the deck the day before the victim's death, and the railing had not been broken at that time. However, the railing was damaged and broken at the time the victim's body was discovered. It is possible that the damage could have resulted from the victim's accidentally falling or tripping over the railing. However, taken together with the white paint smear on defendant's shoe, which matched the chemical composition of the paint on the railing, it is equally likely that the damage to the railing was evidence of a struggle on the deck between defendant and the victim. Moreover, there was evidence that the victim sustained internal abdominal injuries before her death. Both Dr. Cohle and Dr. Dragovic testified that the internal abdominal injuries were more likely

caused by impact with a blunt, protruding object, such as a fist or a foot, than by the victim's impact with the concrete pavement.

Certain evidence in this case also tended to establish defendant's consciousness of guilt. Defendant made numerous statements to many different friends and acquaintances in the days following the victim's death. Certain of these statements were inconsistent, and could certainly have been interpreted by reasonable jurors as evidence of intentional prevarication. Of note, although the evidence at trial clearly established that Linn Duncan found the blue blanket on the concrete pavement at the time he discovered the victim's body, defendant told at least one person in the days following the victim's death that he had personally retrieved the blanket after Duncan had already found the body in order to "keep [the victim] warm." In addition, defendant told the police and most of his friends that when he returned from putting the children to bed, the victim was no longer on the deck. However, defendant told the victim's hairdresser that upon putting the children to bed, he had returned to the deck and the victim was there. According to the hairdresser, defendant told her that "[Florence] was still there, she was fine, so I just went back up to the house. And she never came home." "[C]onflicting statements tend to show a consciousness of guilt and are admissible as admissions." . . . Although not necessarily inculpatory when taken by themselves, these conflicting statements, when considered together with the other circumstantial proofs in this case, lend further evidence from which a rational jury could have inferred defendant's guilt.

There was also evidence that defendant had already packed his vehicle and was eager to leave Watervale with his two children when the police arrived. "[E]vidence of flight is admissible to support an inference of 'consciousness of guilt' and the term 'flight' includes such actions as fleeing the scene of the crime." . . . We acknowledge that defendant did not actually flee the scene. We further acknowledge that it is always for the jury to determine whether evidence of flight occurred under such circumstances as to indicate guilt. . . . However, the evidence that defendant was preparing to leave and had already packed his family's belongings into the vehicle when the victim's body had not even been removed from the lake could have allowed reasonable jurors to infer that defendant had a guilty state of mind.

A rational jury could have also inferred defendant's consciousness of guilt from evidence that defendant wished to have the victim's body immediately cremated. Defendant's desire to have the body cremated could be viewed as an effort to destroy evidence of the crime of murder, thereby showing a consciousness of guilt. . . .

Defendant's own statements concerning the events leading up to the victim's death provided additional evidence from which the jury could have inferred a consciousness of guilt. Defendant told the police and several family friends that on the evening of October 24, 2003, he had left the victim alone on the boathouse deck

when he went to check on the two children. However, substantial testimony at trial revealed that the victim had a lifelong fear of the dark and that she routinely avoided being alone outdoors at night. It is beyond dispute that it was already dark when defendant left the boathouse deck, and certain evidence suggested that it was also raining at the time. . . . Given the victim's lifelong fear of the dark and her routine avoidance of the outdoors at night, a rational jury could have concluded that the victim would not have voluntarily stayed on the boathouse deck alone after dark and that defendant had therefore fabricated his account of the events leading up to the victim's death. A jury may infer consciousness of guilt from evidence of lying or deception. . . .

We acknowledge that the proofs established an absence of past physical violence between defendant and the victim. However, the mere absence of past violence is necessarily of limited value and relevance.

We also acknowledge that Dr. Carl Schmidt and Dr. Igor Paul both opined that the victim likely fell from the deck accidentally. Indeed, Dr. Paul's computer graphics demonstrated to the jury how an accidental fall could have occurred if the victim lost her balance. However, Dr. Paul admitted that he could not rule out the possibility that the victim's fall was caused by the criminal agency of another person. Moreover, the absence of "palms-down" injuries on the victim's body provided evidence from which a rational jury could have concluded that the victim was already unconscious or otherwise incapacitated when she struck the concrete pavement. Although there were some wounds on the victim's hands and arms, Dr. Cohle testified that he did not believe the injuries were sustained as the result of a "palms-down position." In other words, Dr. Cohle did not believe that the hand and arm injuries were consistent with an attempt by the victim to brace herself upon impact with the concrete. Dr. Cohle's testimony in this regard suggested the possibility that the victim's fall from the deck was not accidental. In the end, questions concerning the credibility of Drs. Schmidt and Paul and the weight to be accorded to their testimony were solely for the jury to determine. . . .

*Unger*, 749 N.W.2d at 286–89 (citations omitted).

The jury's verdict indicates that they credited the prosecution's evidence, including other strong, independent evidence that the victim was dragged into the lake. Further, Petitioner overstates the role that the 90-minutes-survival-time testimony played in closing arguments; in actuality, it was but one piece of evidence among many that the prosecution discussed in nearly four hours of closing argument.

In sum, we conclude that the record does not support Petitioner's argument that the performance of his trial counsel was constitutionally deficient. Further, Petitioner has failed to

show a reasonable probability that if counsel had performed differently "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## II.    Prosecutorial Misconduct

### Standard of Review

As explained above, on appeal of a denial or grant of a petition for a writ of habeas corpus, this Court review's the district court's conclusions of law *de novo*, *Gumm*, 775 F.3d at 359–60 (citing *Hanna*, 694 F.3d at 605), and when the district court's findings of fact are, as here, based on a transcript from the petitioner's state court trial, we review those findings of fact *de novo* as well. *Tanner*, 867 F.3d at 671.

To succeed on his habeas claim based on the ineffective assistance of counsel, Petitioner must satisfy an extraordinarily high bar. Again, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S at 686. Under *Strickland*'s two-prong framework, Petitioner first must demonstrate that "counsel's representation was deficient in that it 'fell below an objective standard of reasonableness.'" *Towns*, 395 F.3d at 258 (quoting *Strickland*, 466 U.S. at 688). Then Petitioner must show "prejudice," *i.e.*, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**Analysis**

Petitioner next argues that this Court should grant a writ of habeas corpus for what he alleges was the state court's "unreasonable rejection of Mr. Unger's claim that trial counsel was ineffective for failing to object to prosecutorial misconduct at closing." (Brief for Petitioner at 45.) A defense counsel's failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel. *See Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005). But "[a] petitioner's ineffective assistance claim based on counsel's failure to object will not succeed if the decision not to object flowed from objectively reasonable trial strategy." *Walker v. Morrow*, 458 F. App'x 475, 487 (6th Cir. 2012) (citing *Hodge*, 426 F.3d at 385–86).

The district court identified the following comments challenged by Petitioner. Those comments are again referenced in Petitioner's opening brief on appeal. In brief, those comments include:

- Regarding the testimony of Dr. Igor Paul (who constructed a video animation purportedly depicting how the victim could have moved from the location where she struck the pavement into the water), the prosecutor suggested that defense counsel had paid him to deliberately lie and imagined a conversation between defense counsel and Dr. Paul: "Hey, we got a problem, we need you to come up with a scenario that shows this could have been an accident." (R. 10-19, Trial Tr., PageID # 2799.)

- Also regarding Dr. Paul: "[H]e did what he was paid to do. 'Doctor you've helped me before, help me again. I need an accident scenario. And I need somebody from MIT to come in with their credentials and fool this jury." (R. 10-19, Trial Tr., PageID # 3810.)

- Estimating that Dr. Paul was likely paid $25,000 for his preparation and testimony, and musing: "Reasonable doubt at reasonable prices?" (*Id.* at PageID # 3805.)

- Claiming that defense counsel had "re-victimized" Florence Unger "[b]y painting [her] as some shopping-crazed adulteress" in the hope that the jury would "lose sight of the fact that a human life was senselessly snuffed out." (R. 10-18, Trial Tr., PageID # 3568.)

- Multiple comments indicating that defense counsel was trying to "fool" the jury by asking "deliberately loaded" questions "meant to deter [the jury] from seeing what the real issues are in this case," and referring to defense counsel's use of "smoke and mirrors" and "red herrings" to deflect attention away from Petitioner. (*Id.* at 3568, 3615, 3625–26.)

- The prosecutor's inaccurate statement that Dr. Cohle, the medical examiner, never stated that his confidence in his conclusion that the victim's death was due to homicide was only "51[%], or thereabouts."

*Unger*, 2017 WL 3314289, at \*14–15; (Brief for Petitioner at 45–48).

In adjudicating this claim as part of Petitioner's direct appeal, the Michigan Court of Appeals held that some of these comments "clearly exceeded the bounds of proper argument." *Unger*, 749 N.W.2d at 294. Regarding the prosecution's comments about Dr. Paul, the court said that "[a]rguing that an expert witness had a financial motive to testify is one thing; arguing that the expert has intentionally misled the jury is quite another." *Id.* at 295. The court also held that the "re-victimized" statement "exceeded the bounds of proper argument" and was "improper," since it is well-established under both federal and Michigan law that a prosecutor may not appeal to the jury to sympathize with the victim. *Id.* at 293. Also, the attacks on defense counsel "certainly suggested that defense counsel was trying to distract the jury from the truth" and thus "clearly exceed[ed] the bounds of proper argument." *Id.* at 294. Finally, the court also held that the prosecutor's statement regarding Dr. Cohle was "clearly wrong" and not supported by the record." *Id.*

Nonetheless, the court held that it was not deficient performance for Petitioner's counsel to allow the alleged prosecutorial improprieties. *Id.* at 295–96. The court explained as follows:

> [D]efendant was represented by capable defense counsel throughout the proceedings below. As an experienced attorney, lead defense counsel was certainly aware that there are times when it is better not to object and draw attention to an improper comment. . . . Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy. . . . We will not substitute our judgment for that of counsel on matters of trial strategy, nor

23

will we use the benefit of hindsight when assessing counsel's competence. . . . Defendant has simply failed to overcome the strong presumption that trial counsel's performance was strategic. . . . Nor can we conclude that, but for counsel's alleged errors, the result of defendant's trial would have been different. . . . We find no ineffective assistance of counsel in this regard.

*Id.* at 296 (internal quotation marks and citations omitted).

Reviewing Unger's habeas petition, the district court held that the Michigan Court of Appeals' decision with regard to the performance prong was entitled to AEDPA deference and Petitioner had "failed to show either that defense counsel's performance fell outside the broad range of reasonable trial conduct, or that the state court's conclusion finding no deficient performance was an unreasonable application of Supreme Court precedent." *Unger*, 2017 WL 3314289, at *16. That should have ended the inquiry. However, the district court also recognized that the Appeals court misapplied *Strickland*'s prejudice standard. Following *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006), the district court conducted a *de novo* review of the prejudice issue and held that Petitioner's claim still failed because he "fails to show he was prejudiced by counsel's failure to object." *Unger*, 2017 WL 3314289, at *17. We agree.

The Michigan Court of Appeals concluded that trial counsel's failure to object to the alleged instances of prosecutorial misconduct did not constitute deficient performance. Here on appeal, Petitioner contends that the Appeals court "failed to analyze whether defense counsel's failure to object was reasonable." (Brief for Petitioner at 48–49.) "Instead," Petitioner asserts, "the court concluded that defense counsel's decision *could have been* strategic, and that it was therefore beyond reproach." (Brief for Petitioner at 49 (emphasis in original).) But that is not an accurate account of the court's opinion. The court did not simply allow "strategy" to be used as a "talisman that necessarily defeats a charge of constitutional ineffectiveness." *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 685 (2002). It reviewed the

reasonableness of counsel's strategy and recognized that it was reasonable trial strategy for defense counsel to allow the prosecutors' arguments to proceed uninterrupted, lest the defense call unnecessary attention to the remarks. *Unger*, 749 N.W.2d at 296 (citing *People v. Bahoda*, 531 N.W.2d 659, 672 n. 54 (Mich. 1995) ("[T]here are times when it is better not to object and draw attention to an improper comment.")); *see United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint.")).

We recognize an additional reason for defense counsel to allow the prosecution's comments: namely, objecting would have jeopardized defense counsel's ability to make the same arguments in their own closing. Indeed, defense counsel's closing argument is riddled with the same kinds of arguments that Petitioner now attacks. For instance, defense counsel said of the prosecution's evidence "it's just so, so unfair to deceive you that way," (R. 10-19, Trial Tr., PageID # 2773), and "real evidence, hard evidence, and *this kind of manipulation of evidence*, are two different things." (*Id.* at PageID # 2776 (emphasis added)). And defense counsel was no more kind to the prosecution's experts. Referring to Dr. Dragovic's testimony, counsel said, "Don't be fooled with that kind of nonsense[.]" (R. 10-18, Trial Tr., PageID # 2765.) Or discussing Dr. Dragovic's "publicity-seeking injection of himself into notorious cases":

> You know about his civil practice. You know about his personality and his delight in criticizing other pathologists, and his belief that he and only he knows the answer to pathology questions. You saw his little trick. . . . It's just a trick, a little game he plays to try to downplay the testimony of somebody else.

(R. 10-19, Trial Tr., PageID # 2780.) And then of course there is defense counsel's reference to the "awesome power of the state":

> A state that at the drop of a hat can call up a Dragovic and say, "We need a little help in this case, Doc, we'd like somebody to supply a little premeditation and deliberation, so, you know, let's form a caravan and let's go up and let's do some

things, and let's try to talk the real pathologist involved in the case into something else – to say something else."

(*Id.* at PageID # 2775.)

None of this is to say that defense counsel's own misconduct somehow excuses the prosecution's. Rather, the point is that the record shows that defense counsel could have decided to allow the prosecution's improper remarks in exchange for getting in their own. This is one of a number of reasons why Petitioner's trial counsel could reasonably have chosen not to object to the prosecutor's statements, and Petitioner has offered no evidence (other than his own bald assertions) to show that the failure to object was the result of accident, inattention, or mistaken judgment. Thus, in light of the "high[] deferen[ce]" that this Court must give to counsel's performance, *Strickland*, 466 U.S. at 689, Petitioner has failed to show that defense counsel's performance fell outside the broad range of reasonable trial conduct or that the state court's finding of no deficient performance was an unreasonable application of Supreme Court precedent.

Finally, even assuming that Petitioner's counsel was ineffective in failing to object to prosecutorial misconduct, the petition should be denied because Petitioner has failed to show that he was prejudiced by counsel's failure to object. As the district court recognized, the Michigan Court of Appeals misapplied the "prejudice" prong of *Strickland*. *Unger*, 2017 WL 3314289, at *15. The Appeals court required Petitioner to show that "but for counsel's alleged errors, the result of defendant's trial would have been different." *Unger*, 749 N.W.2d at 243. That is not the *Strickland* standard. Instead, *Strickland* asks only whether "there is *a reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added).

Still, to establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [A]nd not every error that

conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. The prosecutor's arguably improper comments played a relatively small role in the nearly four hours of closing arguments, and they paved the way for defense counsel to make similar arguments of their own. Further, as detailed above, the evidence of Petitioner's guilt was overwhelming. Therefore, any adverse effect to Petitioner's case caused by the prosecution's comments was unlikely to affect the outcome of the trial. Accordingly, any shortcomings in trial counsel's performance likely did not affect it either.

## CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED**.