*Reynolds v. State*, No. 41-3-15 Lecv (Teachout, J., Feb. 21, 2019).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                                **CIVIL DIVISION**
**Lamoille Unit**                                                **Docket No. 41-3-15 Lecv**

**In re STANLEY REYNOLDS**

### DECISION
### Petitioner's Application for Post Conviction Relief

This matter came before the court for final evidentiary hearing on September 20, 2018 and January 3, 2019. Petitioner was present and was represented by Attorney Mark A. Kaplan. The State was represented by State's Attorney Paul Finnerty.

Petitioner seeks relief from a conviction for sexual assault following a jury trial in February of 2012. He asserts a claim of ineffective assistance of his trial counsel.

#### Findings of Fact

The court finds the following facts, based on a preponderance of the evidence, from the evidence from the PCR trial.[1]

Mr. Reynolds is a 70-year-old lifelong resident of Vermont who worked for himself in construction and wood products for over 50 years, primarily in Waterville, Vermont. The events that gave rise to his criminal prosecution took place on February 22, 2010.

He was living with his wife in Waterville. He operated a business called Streetbrook Wood Products that involved selling and delivering firewood and kindling to various retail stores in northern Vermont. His niece, Samantha Turner, who was deaf, had started working for him in the wood business part-time in 2005, bundling and delivering wood. At some point, she had moved into a trailer on the property he owned with his wife. In 2006, he and she began a sexual relationship.

Although it was unknown to his wife, others observed their closeness and suspected an affair. He took her to his deer camp alone several times on a 4-wheeler. Mr. Reynolds' older brother Steven had seen the two of them driving together and saw Samantha Turner sitting extremely close to Mr. Reynolds on a full bench seat in the truck and saw her smiling at him and not taking her eyes off him. He was "sure" that something was going on between them to the extent that he had warned Mr. Reynolds,

---

[1] The court did not have evidence from the underlying criminal trial.

who admitted in 2008 that they were having sex and that it had been going on for some time. Steven Reynolds spoke disapprovingly to Mr. Reynolds about it on two later occasions. Mr. Reynolds's other brother Sidney had also seen the two of them sitting close together, and Mr. Reynolds had asked him to leave the heat on at the family camp, presumably at a time that he was planning to take Samantha Turner there. Sidney had said to Mr. Reynolds, "I hope you're not doing what I think you're doing."

Dorothy and Fred Fletcher live ¼ mile down the road from Mr. Reynolds. Each of them had seen Mr. Reynolds and Samantha Turner drive by several times on a 4-wheeler with Samantha Turner's arms wrapped tightly around Mr. Reynolds, their bodies close. They thought that "something could be going on."

On February 22, 2010, Mr. Reynolds had oral sex with Samantha Turner in the basement of the Reynolds home while Mr. Reynolds's wife was upstairs. He believed that it was consensual. A few days later, police officers came to his home to ask him about it and he admitted to having sex with Samantha Turner but said it was consensual. She had apparently denied it was consensual. He was charged with felony sexual assault.

He hired private counsel, who prepared for and represented him at his first trial, but a mistrial was declared due to procedural fairness problems resulting from the quality of the deaf interpreter(s) at the trial. He no longer had sufficient funds to pay his private lawyer for a second trial, and qualified for a public defender.

On August 8, 2011, Dan Maguire, a member of the serious felony unit in the Public Defender's office, was appointed to represent him. Mr. Maguire called Mr. Reynolds to introduce himself as his lawyer. He obtained the voluminous files from the private counsel from the first trial. He also hired an experienced investigator, Elizabeth Wilkel, to assist him in the preparation of the case.

Mr. Maguire and Mr. Reynolds first met in person at court at the time of a status conference in the case held on September 14, 2011. Ms. Wilkel and Mr. Reynolds's wife, Mary Reynolds (now Marra) were also present. Mr. Maguire has no memory of what occurred that day. Mr. Reynolds asked Ms. Wilkel some questions, and Ms. Wilkel said he should discuss that with Mr. Maguire. Mr. Reynolds testified, and the court finds based on his credible testimony, that he and Mr. Maguire did not spend time discussing the case that day.

Approximately a month later, Mr. Maguire called Mr. Reynolds and asked him to come to the lawyer's office. Mr. Reynolds went with his wife. The interview was approximately 10 minutes long. They did not discuss the case at any length.

The next event was a status conference on November 2, 2011. Mr. Maguire and Ms. Wilkel attended the status conference and Mr. Reynolds was there but he did not go into the courtroom. He testified that Mr. Maguire "didn't let" him; that Mr. Maguire said he "didn't need" him, and that if he needed him, he would come and get him. Mr. Reynolds was at the courthouse that day approximately 30–35 minutes, and did not have

2

a discussion with Mr. Maguire about the case. The conference with the court was a discovery conference, and the lawyer's time was spent addressing with the court the issue of sign/deaf interpreters to be used at the trial. The trial was scheduled for February 13–17, 2012.

Ms. Wilkel called Mr. Reynolds on January 8, 2012. She had the witness list from the private attorney on the first trial and called Mr. Reynolds to go over the witnesses on that list. They spent ½ hour on the telephone. Neither Mr. Reynolds's brothers nor the Fletchers were on the witness list. Mr. Reynolds testified that Ms. Wilkel did not ask him whether there were any other witnesses in addition to those on the list. She testified that she did but gave no specifics. The testimonial evidence does not make it clear one way or the other. However, it was a telephone call that was apparently not prearranged, so even if she did, he may not have been prepared to give a full answer on the spot. It was not a long call with a full review of all aspects of the case.

The next day, January 9, 2012, a pretrial status conference was held at court. Mr. Reynolds remained outside the courtroom while Mr. Maguire went into the courtroom to attend the conference. They did not spend time discussing the case. The State provided new discovery, including a video of the first trial. Pretrial deadlines were set by the court.

On January 24th, Ms. Wilkel prepared trial subpoenas for the witnesses to be called at trial. These were the same witnesses from the private counsel's witness list for the first trial. There had been no investigation by Mr. Maguire or Ms. Wilkel of additional witnesses who might be called.

Mr. Reynolds telephoned Mr. Maguire a couple of times about the case, and Mr. Maguire told him that he would notify Mr. Reynolds when he was ready to talk. Approximately 2 weeks before the trial was scheduled to start, he told Mr. Reynolds by telephone that he would be gone on vacation for one of the two weeks prior to trial.

Ms. Wilkel was working on preparations for trial during this period. She had a meeting with Mr. Reynolds and his wife at Mr. Maguire's office on February 3rd. Mr. Maguire was apparently not there. They discussed the trial, including whether Mr. Reynolds would testify or not. Mary Reynolds was present all the time, except that she left the room when the specific allegations were discussed.

On February 4th, Ms. Wilkel went to Mr. Reynolds' house to prepare for trial, and spent about 1 ½ hours there.[2] She observed the basement and took pictures of it. Mr. Reynolds showed Ms. Wilkel the sound tests that had been done by his first lawyer, indicating that if there had been screaming coming from the basement, it could have been heard by Mrs. Reynolds while she was sitting at the kitchen table. Ms. Wilkel also interviewed Tasha Russin that day. She was on the list for the first trial and was the only witness with whom Ms. Wilkel had a personal interview.

---

[2] Mr. Reynolds believed that this occurred on February 11th, a Saturday, but Ms. Wilkel's billing records show that this event occurred on February 4th, the previous Saturday.

3

On Wednesday, February 8th, Mr. Maguire called Mr. Reynolds and asked him to come to his office the next day. On Thursday, February 9th, Mr. Reynolds and his wife met with Mr. Maguire and Ms. Wilkel for 2 ½ to 2 ¾ hours to discuss the case in preparation for trial. At that time, Mr. Reynolds told Mr. Maguire about witnesses that he wanted to have subpoenaed. These were people who knew about the parties' sexual relationship, and they had not been on the witness list for the first trial. Mr. Maguire said that there was not enough time to subpoena them, and he did not take their names. The evidence shows that Ms. Wilkel had already completed trial preparation and discussions with Mr. Maguire. She had completed subpoenas for trial witnesses.

The name of Tim Burton had come up shortly before trial, although it is not exactly clear when. He was a man Samantha Turner had known for a long time and gone out with. The family believed that he was a person with whom Samantha Turner was texting during the time she was in the basement. Ms. Wilkel made some effort to locate him and got a post office box address, but was instructed by Mr. Maguire not to interview him before trial. Mr. Maguire deliberately chose not to interview Tim Burton before trial as he was concerned that such an interview might produce inculpatory testimony.

Neither Mr. Maguire nor Ms. Wilkel took steps to recover phone record information or the text messages from either phone (Samantha Turner's or Tim Burton's), which might have shown whether she had her phone or not at the time of the sex and if so what she said. As she is deaf, her communications are through signing or texting.

On Saturday, February 11th, Ms. Wilkel talked with Mr. Reynolds by telephone and spent a total of 5 hours preparing for trial. At that point, Samantha Turner had made contradictory statements concerning whether she had her phone at the time of the sex and could have used it or did use it.

Prior to trial, neither Ms. Wilkel nor Mr. Maguire were aware of Steven or Sidney Reynolds or Fred or Dorothy Fletcher or the fact that they had evidence of the prior ongoing sexual relationship between Mr. Reynolds and Samantha Turner.

The jury was drawn on February 13th, and the trial took place from February 14th to 17th. Mr. Reynolds was convicted. He was sentenced to 5 years to life.

Samantha Turner's testimony at trial was that she had been held hostage by Mr. Reynolds in the basement on February 22, 2010 when he had oral sex with her. The subject of Samantha Turner having sent 37 texts apparently came up. Samantha Turner had given different versions of her use of the cell phone on February 22, 2010. At the first trial, she testified that she had her cell phone with her but was afraid to use it, although apparently her testimony from the first trial was not presented to the jury. At the second trial, she testified that Mr. Reynolds took it away and did not return it to her until later; Mary Reynolds testified that Samantha Turner texted her at 12:10 in the afternoon. At Samantha Turner's deposition, she had said that she had her cell phone but

4

only used it to play games. At trial, Samantha Turner said she did not make 37 calls, and the State suggested in closing argument that the 37 texts could have resulted from "butt-dialing."

Tim Burton was interviewed by Ms. Wilkel over six months after the trial. He acknowledged receiving text messages from Samantha Turner on the day in question, but said he could not remember the content. He clearly had a hostile attitude toward Mr. Reynolds.

During trial preparation, Ms. Wilkel primarily worked from materials and the witness list of the prior private counsel in preparing evidence and witnesses for trial. The only witness she interviewed in person was Tasha Russin. Ms. Wilkel's testimony was that the family never suggested the names of any other people who were aware of a prior consensual sexual relationship.

At trial, the theory of the defense was that the sex was consensual, that the sexual encounter on February 22, 2010 was part of a long consensual sexual relationship, and that Samantha Turner's testimony was not credible. Mr. Maguire vigorously sought to impeach Samantha Turner on cross-examination by pointing out the inconsistencies in her testimony over time, such as about having or using a cell phone. Mr. Reynolds chose not to testify, so the evidence about a longstanding consensual sexual relationship did not get before the jury through him. Apparently his grandson gave testimony that Mr. Reynolds was having an affair, but the content of that testimony is unknown.[3] While Mr. Maguire made reference to the jury in closing argument about the history of a consensual sexual relationship, there had not been very much factual evidence presented to the jury that there had been a three-year sexual relationship prior to the charged event.

Mr. Maguire testified at the PCR hearing, and the court finds, that to support the consensual theory of the defense it was important to have evidence of both of two elements: the prior sexual relationship between the parties, plus impeachment of Samantha Turner's credibility. The combination of both would undermine the State's ability to prove guilt beyond a reasonable doubt and improve the chances of acquittal.

The testimony at the PCR hearing of both Ms. Wilkel and Mr. Maguire was generalized and nonspecific about conversations they had with Mr. Reynolds concerning other witnesses. Both testified that they "would have" asked him about other witnesses. There is no evidence that either of them engaged in a full conversation with Mr. Reynolds about the case, other than shortly before trial. The court finds that there were no conversations early on in which either the attorney or the investigator engaged meaningfully with Mr. Reynolds to explore whether there were other witnesses who could testify as to the sexual relationship.

Both Petitioner and the State presented expert witness testimony from highly experienced defense attorneys concerning the standard of practice for trial counsel under

---

[3] As noted above, this court has no evidence of what evidence was admitted at trial.

the circumstances, whether or not Mr. Maguire's work met or fell below that standard, and whether or not any alleged deficiency would have impacted the outcome.

Attorney Ernest Martin Allen III testified for Petitioner that trial preparation was inadequate in that there should have been lengthy conversations with the client taking place early in the process, soon after the appointment as counsel, to provide enough lead time to identify all possible witnesses and find out what they would say. He testified that it would have been important to talk with Tim Burton and to make an effort to recover the text messages because of the important impact those messages had on the credibility of Samantha Turner. He testified that Mr. Maguire should have used Samantha Turner's testimony from the first trial when she said that she had her phone and was afraid to use it, because it would have been evidence that she had her phone, whereas Samantha Turner testified at the second trial that Mr. Reynolds had taken it away from her. He further testified that there should have been more attention given to finding witnesses to testify about the parties' prior sexual relationship because it was an important fact that Samantha Turner denied. He testified that earlier and adequate preparation, more effective cross-examination about the cell phone, and presenting witnesses who knew about the prior relationship would have enhanced the chances of acquittal.

Attorney David Williams testified for the State that the trial preparation was "more than adequate," and that Mr. Maguire did an excellent job "based on what he had at the time." He testified that the witnesses called were sufficient: the grandson on the fact of an affair occurring prior to the event, and Mary Reynolds that she did not hear any sounds from the basement and that Samantha Turner texted her on that day. As to the witnesses selected and presented, he testified that Mr. Maguire "worked with what he had," and that he (Mr. Maguire) did not know about Mr. Reynolds's brothers or the Fletchers because no one had told him about them.

Mr. Williams testified that this is the most serious type of felony case there is because it carries a potential life sentence, and therefore it is important to have detailed conversations early on in the case to get as much information as possible in order to get leads that could lead to possibly exculpatory information and have time to explore them. He agreed that meetings a few days before trial do not normally provide enough time to prepare, although his opinion was that it did not make a difference in this case because the brothers and Fletchers were not brought forward as witnesses until after the trial. He acknowledged that if the brothers or the Fletchers were identified before trial and the attorney said it was too late, that would be ineffective assistance of counsel. He agreed that if the brothers had been called as witnesses at trial, it would have made a difference in the outcome, as it would have provided greater evidence of consensual sex. While he would have instructed an investigator to interview Tim Burton before trial because it would have shown that Samantha Turner had her phone and was using it and was therefore not credible, his testimony was that the failure to do so did not affect the outcome because the post-trial interview with Mr. Burton indicates that his evidence would not have been exculpatory.

The court cannot find that either the attorney or investigator had conversations with Mr. Reynolds at a reasonable time after appointment, with sufficient lead time before trial to investigate, in which they discussed the case fully with him and explored the issue of whether there might be other witnesses who could testify that there was a prior consensual sexual relationship. There is no clear evidence that either of them ever asked him that question in a meaningful way. The evidence is credible that Mr. Reynolds was waiting to have a full conversation, because he had had such conversations with his prior counsel, and so he expected it, but it did not take place until a few days before trial, at which time he was told that the information he wanted to provide was too late. If the question had been put to him in a timely way, he would have been able to identify at least his brothers, as one brother had scolded him about the relationship at least three times, starting in 2008, and the other had let him know that he suspected the affair. It is also probable that Mr. Reynolds would have been able to identify the Fletchers as possible witnesses, as he would have seen them observing him on the 4-wheeler with Samantha Turner on several occasions and the manner in which Samantha Turner was riding with him. However, there is no evidence about exactly what names he wanted to give Mr. Maguire at the meeting shortly before trial.

The evidence shows that Mr. Maguire relied heavily on the work that the prior counsel had done to prepare for the first trial, and then relied heavily on the work of Ms. Wilkel as the investigator to organize and prepare that material for trial. It also shows that she relied exclusively on the witness list prepared by the prior counsel. Neither of them actively solicited from Mr. Reynolds at a sufficiently early stage of preparation whether there were additional witnesses who could testify about the prior sexual relationship. The standard of practice does not place the burden on the client to ensure that a full discussion of the case takes place in a timely manner or to identify all possible witnesses without solicitation from the attorney. The court finds that counsel's work, either through himself or his investigative assistant, fell below the required standard of practice under the circumstances.

Although it is difficult for this court to tell in the absence of a transcript from the trial, the evidence suggests that trial evidence on the issue of consent was testimony of Mr. Reynolds's grandson that he knew his grandfather was having an affair. The evidence before this court from the PCR trial is limited to that level of generality: it is unknown what the grandson's testimony actually was. Otherwise, on the issue of consent, trial counsel apparently sought to impeach the credibility of Samantha Turner by questioning her vigorously on cross-examination about inconsistent testimony, but again, it is unknown to this court what the testimony actually was. The court finds that additional evidence in the form of testimony from Mr. Reynolds's brothers, both about the fact of a sexual relationship and the length and extent of it, and in the form of the Fletchers' observations would have strengthened evidence showing that the sex that day was part of a pattern of a consensual sexual relationship that had taken place over years. Such additional testimony also could have made jurors more skeptical about her credibility and provided more material for trial counsel to challenge credibility on cross-

7

examination.[4]  Such evidence most likely would have provided more material for cross-examination and thus greater chances for Mr. Maguire to impeach Samantha Turner's credibility.  The combination of stronger evidence of the prior sexual relationship and stronger impeachment evidence would have improved the chances of acquittal.  Both experts were of the opinion that if the jury had believed that the sex was consensual, Mr. Reynolds should have been acquitted.  However, whether it would have improved the chances of acquittal enough to make a difference cannot be determined from the evidence.

## Conclusions of Law

The basic standard for evaluating post-conviction claims of ineffective assistance of counsel is as follows:

> The appropriate standard for reviewing claims involving ineffective assistance of counsel is whether a lawyer exercised "that degree of care, skill, diligence and knowledge commonly possessed and exercised by reasonable, careful and prudent lawyers in the practice of law in this jurisdiction."  To demonstrate ineffective assistance of counsel, a petitioner must show by a preponderance of the evidence that: (1) [the deficiency component] his counsel's performance fell below an objective standard of performance informed by prevailing professional norms; and (2) [the prejudice component] there is a reasonable probability that, but for counsel's unprofessional errors, the proceedings would have resulted in a different outcome.  Unless petitioner is able to satisfy both prongs of the test, "it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable."  In making this showing, petitioner cannot rely on the distorting effects of hindsight, and must surpass the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance.

*In re Grega*, 2003 VT 77, ¶ 7, 175 Vt. 631 (citations omitted).  The prejudice component is further described as follows:

> 'A reasonable probability [of a different outcome] is a probability sufficient to undermine confidence in the outcome."  The defendant is not required . . . to show that counsel's deficient performance 'more likely

---

[4] While an unconsented sexual encounter can occur following an extended intimate relationship based on consensual sex, there was no evidence at the PCR trial that Ms. Turner testified as such.

than not' altered the outcome of the case. . . . On the other hand, it is not enough for the defendant 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Instead, counsel's errors must have been 'so serious as to deprive the defendant of a fair trial.' The likelihood of a different result must be substantial, not just conceivable. '[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."

Brian R. Means, Postconviction Remedies § 35:4 (footnotes omitted).


Petitioner has shown that his counsel's performance leading up to the second criminal trial fell below an objective standard of performance. Neither counsel nor his investigator engaged Petitioner in a full discussion of the case at an early enough time so that any possible witnesses favorable to the defense could be identified and interviewed. Witnesses were out there to be found, particularly those who could have testified to the effect that Mr. Reynolds' and Ms. Turner's prior conduct appeared to be outwardly consistent with an established sexual or intimate relationship. Such testimony could have helped contextualize any sexual contact on the day in the question and helped undermine Ms. Turner's credibility. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). No reasonable explanation for counsel's lack of inquiry and investigation was forthcoming at the PCR hearing. Defense counsel and his investigator apparently simply relied too much on the work of their predecessors and failed to take a fresh look at the case.

A deficiency in counsel performance alone, however, is insufficient to warrant postconviction relief. An award of relief depends on whether the deficiency caused prejudice. The prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the [criminal] trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In a case such as this, the court is called upon to contrast the trial that happened (Mr. Reynold's second criminal trial) with the one that arguably may have happened absent the deficiency. "[I]n making the prejudice determination, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury [in the criminal trial].'" Burkoff & Burkoff, Ineffective Assistance of Counsel § 4:10 (quoting *Strickland*, 466 U.S. at 695).

In this case, it is clear that if there had been no deficiency, defense counsel would have been aware of witnesses who may have been able to effectively testify to the effect that they suspected that there had been a long-term sexual or intimate relationship between Mr. Reynolds and Ms. Turner. Such evidence may have improved counsel's ability to persuade the jury that such a relationship had existed and that Mr. Reynolds'

9

accuser lacked credibility. One may surmise, as a general matter, that a trial with this evidence would have been preferable to the defense than one without it.

The prejudice question, however, is not whether defense counsel, in hindsight, could have done something better. The issue is whether the performance deficiency, viewed in the context of the totality of the circumstances at trial, rendered the trial fundamentally unfair. As stated above, the "likelihood of a different result must be substantial, not just conceivable." Means, *infra.* The court has no reasonable ability to make this assessment in this case because the record of this PCR case includes virtually no evidence of what transpired at the criminal trial (either of them). The only evidence of what occurred at the criminal trial were passing generalized references that each expert made based on their review of transcripts. Petitioner did not submit a transcript or recording of the criminal trial, and the PCR hearing did not include any detailed evidence of what transpired at the criminal trial. Petitioner's expert, in testifying about prejudice, essentially opined that the criminal trial would have been better for Mr. Reynolds with the testimony that criminal counsel failed to discover. His testimony did not explain in any detail how that testimony would have fit into the circumstances that actually unfolded at trial and explain how its absence made the trial unfair or prejudicial.

Criminal counsel was able to present the defense's theory of the case to the jury. Apparently, though Mr. Reynolds did not testify, there was testimony to the effect that there had been an ongoing sexual or intimate relationship, or appearance of one, between Mr. Reynolds and Ms. Turner, and criminal counsel aggressively sought to undermine Ms. Turner's testimony otherwise. Thus, at least to some extent, the missing testimony would have been cumulative. See *Hanna v. Ishee*, 694 F.3d 596, 619 (6th Cir. 2012) (noting that the prejudice prong is difficult to satisfy "where the omitted testimony would be cumulative to other evidence already on the record").

Without clear evidence of what happened at the trial, the court has no way to determine now whether the evidence of guilt was devastating and overwhelming and easily able to withstand some additional evidence favorable to the defense or whether it was scant and so close a call that any additional help for the defense may have made the difference. The court cannot determine whether the testimony that was not presented may have been readily absorbed into the prosecution's theory of the case or whether it would have squarely conflicted with it. For example, if Ms. Turner testified to the effect that there had not been an ongoing sexual relationship, she may have readily agreed, if confronted with the testimony, that she had an outwardly *affectionate* relationship with her uncle that may have looked like a sexual relationship to third parties who did not know better. Alternatively, she may have admitted to a prior sexual relationship but testified that she had ended it and did not consent to sex on the day of the charged conduct. The court has no way to gauge such speculations without a record of what happened at trial.

Ultimately, Petitioner has attempted to turn proof that defense counsel could have done a better job into the speculative possibility that the outcome could have been

different, but a speculative possibility does not meet the necessary standard of proof by a preponderance of evidence. "[M]ere speculation is not sufficient to satisfy [Petitioner's] burden" of demonstrating prejudice. *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011); accord *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013); *United States v. Fulks*, 683 F.3d 512, 522 (4th Cir. 2012); *Janosky v. St. Amand*, 594 F.3d 39, 49 (1st Cir. 2010); *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989).

While defense counsel's performance was deficient, Petitioner has failed to meet the burden to show that the deficiency caused prejudice.

## ORDER

Based on the foregoing, Mr. Reynolds' petition for post-conviction relief is denied.

Dated at Montpelier, Vermont this _____ day of February 2019.

_____
Hon. Mary Miles Teachout
Superior Court Judge

11